[No. B060023. Second Dist., Div. Six. Feb. 11, 1992.]

BONNIE J. HARRIS, Petitioner, v.
THE SUPERIOR COURT OF VENTURA COUNTY, Respondent;
JANICE ROSE SMETS et al., Real Parties in Interest.

**COUNSEL**

David Patrick Callahan for Petitioner.

No appearance for Respondent.

Sueann E. Sherry and Susan S. Bauguess for Real Parties in Interest.

## OPINION

**GILBERT, J.**—In determining a party's ability to pay spousal support, should the court consider contributions made by any person to that party's living expenses? Of course. (*In re Marriage of Tapia* (1989) 211 Cal.App.3d 628 [259 Cal.Rptr. 459].) Does it follow that, in order to determine the expenses of that party, the financial records of a third person living with such party are automatically discoverable? Of course not.

▮ Petitioner, a former spouse, who is seeking to increase child support, subpoenaed confidential information from her former spouse's housemate. The trial judge stated that in support cases it is his routine to consider new mate income. The routine is appropriate so long as it does not result in the routine issuance of discovery orders. Here, he should have quashed the subpoena. We grant a peremptory writ of mandate.

### BACKGROUND

On November 1, 1989, Janice Smets and Claude Smets entered into a marital settlement agreement. Included in the agreement was Claude Smets's promise to pay child support.

On October 1, 1990, Mr. Smets moved into a house owned by petitioner, Bonnie J. Harris. Ms. Smets believes that Ms. Harris and Mr. Smets are sharing living expenses, such as food, housing, and utilities.

On May 9, 1991, Ms. Smets moved to increase the amount of child support. She contends that Mr. Smets is able to pay more child support because Ms. Harris is helping him to pay his living expenses. (*In re Marriage of Tapia, supra*, 211 Cal.App.3d 628.) In order to support this contention, she served two subpoenas duces tecum on Ms. Harris.

The subpoenas required Ms. Harris to produce her wage statements and tax returns. In her affidavit in support of the subpoenas, Ms. Smets stated that Harris's income is circumstantial evidence of her contribution to Mr. Smets's living expenses and of his ability to pay increased child support.

Ms. Harris moved to quash the subpoenas. (Code Civ. Proc., § 1985.3, subd. (g).) In her declaration in support of the motion to quash, Ms. Harris stated, among other things, that:

She rents a room in her house to Mr. Smets, a coworker, for $600 a month;

He pays a portion of expenses, which include telephone bill, utilities, and food, and both of them keep receipts documenting those expenses;

She and Mr. Smets share no joint accounts, and she has disclosed no facts to Mr. Smets regarding her income or financial condition, nor does he have access to her financial records;

She does not directly, or indirectly, financially support Mr. Smets.

Moreover, Ms. Harris asserts that disclosure of the financial information requested in the subpoenas duces tecum violates her right of privacy under article I, section 1 of the California Constitution. (See *Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652 [125 Cal.Rptr. 553, 542 P.2d 977]; *Moskowitz* v. *Superior Court* (1982) 137 Cal.App.3d 313 [187 Cal.Rptr. 4].) She also argues that Ms. Smets has not made a threshold showing that disclosure of the privileged information sought is directly relevant or essential to a fair resolution of the case. (See *Britt* v. *Superior Court* (1978) 20 Cal.3d 844, 859 [143 Cal.Rptr. 695, 574 P.2d 766].)

The superior court denied the motion to quash, citing *In re Marriage of Tapia, supra*, 211 Cal.App.3d 628. The court ruled that a nonmarital cohabitant's income affects a former husband's ability to meet the needs of his former wife and, therefore, it "routinely considers new mate income in resolving support issues." Ms. Harris wishes to alter the outcome of this routine and seeks review by way of a petition for writ of mandate. We granted an alternative writ of mandate and stayed enforcement of the subpoenas.

## DISCUSSION

■ "Personal financial information comes within the zone of privacy protected by article I, section 1 of the California Constitution." (*Moskowitz* v. *Superior Court, supra*, 137 Cal.App.3d at p. 315, fn. omitted.) Nevertheless, one's constitutional right of privacy is not absolute and, upon a showing of some compelling public interest, the right of privacy must give way. (*Board of Trustees* v. *Superior Court* (1981) 119 Cal.App.3d 516, 525 [174 Cal.Rptr. 160]; *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123, 131 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219].)

A case involving child support necessarily involves the public interest. First, the state has a compelling interest to ensure that children receive adequate care and support. (E.g., see *Hansen* v. *Department of Social Services* (1987) 193 Cal.App.3d 283, 293 [238 Cal.Rptr. 232]; *Cunningham* v. *Superior Court* (1986) 177 Cal.App.3d 336, 339 [222 Cal.Rptr. 854].) Second, "[t]he state has a significant interest in facilitating ' ". . . the ascertainment of truth and the just resolution of legal claims . . . ." ' " (*Scull* v. *Superior Court* (1988) 206 Cal.App.3d 784, 790 [254 Cal.Rptr. 24].)

■ When the right to discovery conflicts with a privileged right, the court is required to carefully balance the right of privacy with the need for discovery. (*Valley Bank of Nevada* v. *Superior Court, supra,* 15 Cal.3d at p. 657; *Scull* v. *Superior Court, supra,* 206 Cal.App.3d at p. 790.)

The proponent of discovery of constitutionally protected material has the burden of making a threshold showing that the evidence sought is "directly relevant" to the claim or defense. (*Britt* v. *Superior Court, supra,* 20 Cal.3d at pp. 859-862; Weil & Brown, Civil Procedure Before Trial (1991) Scope of Discovery, § 8:320, p. 8C-51.1.) ■ Here, Ms. Smets claims that the financial information she seeks is directly relevant because she believes Ms. Harris's income is available to Mr. Smets. She argues that *In re Marriage of Tapia, supra,* 211 Cal.App.3d 628, supports her discovery request.

*A short digression on the subject of what cases mean—obligations of the writer and the reader*

"It should come as no surprise to the legal community that the overall quality of appellate opinions has measurably declined in the last 25 years." This gloomy appraisal was made by a Supreme Court justice in a manual on judicial opinion writing.[1] Yet, a host of distinguished commentators have written with eloquence on the subject of judicial opinions.[2] Perhaps their books have been on the shelf too long.

Also unsurprising is the decline in the quality of reading and interpreting opinions. Granted, it is hard to be a good reader of a poorly written opinion; unfortunately, there are many poor readers of well-written opinions. The writer of a poorly written opinion does not deserve a good reader, and a good reader deserves more than a poorly written opinion. The matching of good writers and readers is a match in heaven. The match here may have been made elsewhere.

An opinion ought to be written so that a reasonably intelligent reader knows what it means. The opinion ought to be concise and clear, not vague and obscure. The holding of a case should state a principle of law with

---

[1]Foreward by retired Alabama Supreme Court Justice Richard L. Jones to Judicial Opinion Writing Manual, A Product of the Appellate Judges Conference, Judicial Administration Division, American Bar Association (West 1991) page v.

[2]For just a few examples, see Witkin, Manual on Appellate Court Opinions (1977); Aldisert, Opinion Writing (1990) section 1.1, page 1; Mellinkoff, The Language of the Law (1963); Mikva, *For Whom Judges Write* (1988) 61 So.Cal.L.Rev. 1357; Thompson & Oakley, *From Information to Opinion in Appellate Courts: How Funny Things Happen on the Way Through the Forum* (1986) Ariz. State Bar J. 1; Leflar, *Some Observations Concerning Judicial Opinions* (1961) 61 Colum. L.Rev. 810, 817-818 (hereafter *Some Observations*).

sufficient clarity so that persons can carry on their affairs with reasonable predictability as to the legal consequences of their actions. If, however, an opinion be reasonably susceptible to different interpretations, then the writer may have failed to meet his or her obligation.

On the other hand, if the reader lets the wish for a particular result color the meaning of an opinion, then the reader has not met his or her obligation. It is understandable that lawyers often view a case only from the perspective that favors their client. Lawyers, however, should not practice ". . . the art of proving by words multiplied for the purpose, that *white* is *black*, and *black* is *white*, according as they are paid." (Swift, Gulliver's Travels (1726) A Voyage to the Country of the Houyhnhnms, ch. 5.)

This approach is unproductive because " '[a] litigant cannot find shelter under a rule announced in a decision that is inapplicable to a different factual situation in his own case, nor may a decision of a court be rested on quotations from previous opinions that are not pertinent by reason of dis-similarity of facts in the cited cases and in those in the case under consid-eration.' " (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1157 [278 Cal.Rptr. 614, 805 P.2d 873], quoting *Southern Cal. Enterprises* v. *Walter & Co.* (1947) 78 Cal.App.2d 750, 757 [178 P.2d 785].)

Even "[t]he devil can cite scripture for his purpose . . . ." (Shakespeare, Merchant of Venice, act I, scene 3, line 99.) Counsel must therefore not misconstrue the holding of an opinion in order to make it applicable to the facts of his or her client's cause. ■ " 'It is the general rule that the language of an opinion must be construed with reference to the facts presented by the case, and the positive authority of a decision is coextensive only with such facts.' " (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 734-735 [257 Cal.Rptr. 708, 771 P.2d 406], quoting *River Farms Co.* v. *Superior Court* (1933) 131 Cal.App. 365, 369 [21 P.2d 643].)

Even the dispassionate critic must take heed. "[S]ome misimpressions are created by the reader or critic who takes a sentence or paragraph from an opinion, sometimes out of context, and analyzes it as a Shakespeare scholar would, or as though it were a verse from Holy Writ, discovering hidden meanings, innuendoes, and subtleties never intended." (*Some Observations, supra,* 61 Columb. L.Rev. at p. 817.)

In an attempt to extract legal principles from an opinion that supports a particular point of view, we must not seize upon those facts, the pertinence of which goes only to the circumstances of the case but is not material to its holding. The *Palsgraf* rule, for example, is not limited to train stations.

(*Palsgraf* v. *Long Island R. Co.* (1928) 248 N.Y. 339 [162 N.E. 99]; see also Aldisert, *supra*, at § 8.7, pp. 102-104.) The reader who distinguishes between facts germane to the holding, and those that are not, can assess the reasonable extensions of the holding. A reader must realistically appraise what he or she reads and resist the temptation to see a grin without a cat. (Carroll, Alice's Adventures in Wonderland, ch. 6.) Ultimately this approach is more effective to advance a client's cause and the cause of justice.

We writers and readers of opinions should heed the admonition of Voltaire. "Let all the laws be clear, uniform and precise: to interpret laws is almost always to corrupt them." (A Dict. of Legal Quotations (1987) p. 18.)

*End of digression—How the preceding discussion relates to Tapia*

In *Tapia*, an ex-husband, Mr. Tapia, was obligated to pay spousal support. He was living in a house with a nonmarital partner, Jane P. She testified that she and Mr. Tapia had purchased the house as joint tenants and that she paid 50 percent of all household expenses, including the mortgage.

We held in *Tapia* that the nonmarital partner's income must be considered to the degree it reduces the ex-husband's living expenses because that, in turn, affects the husband's ability to pay support. We pointed out the relevant facts that gave rise to the legal principle, and specifically emphasized that "[t]he nature of the relationship between the two people is of no importance." (*In re Marriage of Tapia, supra,* 211 Cal.App.3d at p. 631.)

In *Tapia*, we repeated the notion stated in *Fuller* v. *Fuller* (1979) 89 Cal.App.3d 405, 410 [152 Cal.Rptr. 467], that the relevant factor is not the source of money available to the ex-husband but the existence of that money. It could come from relatives, friends, investments, trusts, or the lottery. The holding in *Tapia* would have been no different had any of these circumstances occurred. It just so happened that Mr. Tapia was living with someone who testified that she paid half their expenses.

 As aptly pointed out by Ms. Harris, the issue in *Tapia* was not the consideration of the entire income of a nonmarital person, but the nonmarital cohabitant's contribution to Mr. Tapia's expenses. Because it is not the nature of the relationship that is important to the principle derived in *Tapia*, the case does not support the proposition that it is always appropriate to serve a subpoena duces tecum for financial records on someone living with an ex-husband who pays child support. *Tapia* does not so hold, and such an inference cannot be reasonably derived from its holding.

Ms. Harris's declaration under penalty of perjury provides much useful information to Ms. Smets. Although Ms. Smets is skeptical about the declaration, she can learn more of the financial arrangements between Ms. Harris and Mr. Smets by directing her discovery towards Mr. Smets.

It does not follow that merely because Ms. Harris lives in the same house with Mr. Smets she has waived her right of privacy. Waiver of constitutional rights must be knowing and intelligent. (*Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 274 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]; *In re Moss* (1985) 175 Cal.App.3d 913, 926 [221 Cal.Rptr. 645].) "[I]t is well established that courts closely scrutinize waivers of constitutional rights, and 'indulge every reasonable presumption against a waiver.' " (*Sambo's Restaurants, Inc.* v. *City of Ann Arbor* (6th Cir. 1981) 663 F.2d 686, 690, quoting *Aetna Ins. Co.* v. *Kennedy* (1937) 301 U.S. 389, 393 [81 L. Ed. 1177, 1180-1181, 57 S.Ct. 809].)

Under other facts, some discovery of a third party's financial records may be appropriate. An ex-husband, for example, upon moving in with a third party, is suddenly living in sumptuous surroundings, driving luxury cars and wearing expensive clothes. Depending upon what the discovery of the ex-husband reveals, discovery concerning financial contributions made by a third party to the ex-husband's living expenses may be appropriate.

Even under these circumstances, the third party deponent is presumptively entitled to a protective order that limits disclosure of financial information. (*GT, Inc.* v. *Superior Court* (1984) 151 Cal.App.3d 748 [198 Cal.Rptr. 892].) The trial court is required to limit the scope of inquiry to the extent necessary to a fair resolution of the case. (*Moskowitz* v. *Superior Court, supra,* 137 Cal.App.3d at p. 316.) The court is obliged to examine the financial information in chambers and shall exclude from disclosure any information that does not meet this standard. (*Valley Bank of Nevada* v. *Superior Court, supra,* 15 Cal.3d at p. 658.)

### CONCLUSION

Let a writ of mandate issue commanding respondent superior court to set aside its order denying the motion and to enter a new order granting said motion. The alternative writ, having served its purposes, is discharged.

Stone (S. J.), P. J., and Yegan, J., concurred.