[No. B095913. Second Dist., Div. One. Mar. 7, 1996.]

MELISSA GILBERT, Plaintiff and Appellant, v.
NATIONAL ENQUIRER, INC., et al., Defendants and Appellants.

## COUNSEL

Stein, Kahan & Rosenberg, Marcia J. Harris, Samuel R. Pryor and Patricia A. Gandras for Plaintiff and Appellant.

Irell & Manella, Bruce A. Wessel, Thomas V. Reichert, Williams & Connolly, Paul Martin Wolff, Richard S. Hoffman, Paul B. Gaffney, N. Reid Neureiter and Richard A. DeSantis for Defendants and Appellants.

Weil, Gotshal & Manges and R. Bruce Rich as Amici Curiae on behalf of Defendants and Appellants.

## OPINION

**ORTEGA, J.**—In this appeal involving a defamation and invasion of privacy lawsuit brought by a well-known actress against her ex-husband and the National Enquirer, Inc., we reverse the preliminary injunction restraining the ex-husband from disclosing his allegedly defamatory statements regarding the plaintiff's sexual relationships and substance abuse. We affirm the order denying the plaintiff's motion to seal the record in this lawsuit.

### BACKGROUND

Plaintiff Melissa Gilbert is a well-known actress. From ages nine through nineteen, she starred as Laura Ingalls in the long-running television series, *Little House on the Prairie*. As an adult, she has performed in numerous television movies and series (such as *Sweet Justice* and *Cries from the Heart*), stage productions, and a motion picture.

Defendant Chester Harry Brinkman III, an actor and screenwriter, was once married to Gilbert. They have one son, Dakota Brinkman, who was born in 1989. The marriage ended in divorce, with Brinkman and Gilbert sharing joint custody of Dakota.

Defendant National Enquirer, Inc. (the Enquirer) published an interview with Brinkman in its July 4, 1995, National Enquirer, which is the basis of Gilbert's defamation and invasion of privacy lawsuit against Brinkman and the Enquirer. The article was published despite Gilbert's attorney's prior warning that the proposed article contained false and defamatory statements about Gilbert.

### A. *The Brinkman Interview*

The July 4, 1995, National Enquirer headline announced, in large, italicized, and bold print, that "Melissa Gilbert is a cold-blooded mother who

forced our little boy to live in a car!" According to the article, Brinkman had given "a scathing exclusive interview" in which he accused Gilbert of being a " 'deadbeat mother,' " of ignoring their son when he spends weekends with her, and of forcing their son to live in a car when Brinkman became homeless following the 1994 earthquake. The article further stated that Brinkman was the one who had fed their infant son at night, that Gilbert had refused to enter their son's bedroom for fear of catching the chicken pox, and that Gilbert had worn earplugs to shut out the child's cries. The article contained other anecdotes by Brinkman concerning Gilbert's alleged short-comings as a mother.

The National Enquirer article explained that Brinkman had "decided to speak out after getting fed up with Melissa's public comments about the importance of motherhood to her. She recently told The ENQUIRER that lessons she learned from her TV dad Michael Landon help her to be a better mom. [¶] 'Melissa doesn't know how to be a mother,' Bo [Brinkman] fumed."

The National Enquirer article also stated, on the other hand, that Gilbert had unequivocally denied Brinkman's allegations contained in the article. It also quoted Gilbert's publicist, who described Gilbert as a " 'great mom.' "

B. *Other Publicity Regarding Gilbert's Personal Life and Lawsuit*

As indicated in the July 1995 interview, this was not the first time the couple's private affairs were brought into public view. The record contains a 1992 National Enquirer article which had as its headline, "Melissa Gilbert ditches her boozing hubby . . . & finds instant love with 'Scarecrow' star." The opening paragraph of that article stated: "Melissa Gilbert has booted her boozing husband out of their house and is getting a divorce. But she's not heartbroken—because she's already madly in love with a new guy, hand-some "Scarecrow and Mrs. King" star Bruce Boxleitner." Although Gilbert was not quoted directly in the article, her alleged statements to friends were printed in the article.

The 1992 National Enquirer article further stated, without attribution, that Gilbert's marriage to Brinkman had failed due to his heavy drinking. It claimed that Brinkman's rehabilitation efforts were unsuccessful and that while on location in Pennsylvania, Brinkman was "a notorious barfly and night owl," who had spent each night " 'drinking and chatting up the local girls.' "

The record also contains an October 15, 1994, edition of TV Guide, featuring Gilbert's photograph on the cover with the headline: "Exclusive [¶]

Melissa Gilbert [¶] Her career's on a roll, her love life's a wreck [¶] From Michael Landon Jr. to Rob Lowe to Bruce Boxleitner—what a rocky trail from that 'Little House'!" The accompanying article, written prior to Gilbert's reconciliation with Boxleitner, whom she later married, discussed her disappointing personal life: "It has been a painful theme for Gilbert: lucky in work, unlucky in love. In fact, all the men she has loved have gone away. From her adored adoptive father, respected comedian Paul Gilbert, who died of a stroke when she was 11, to her beloved father figure, Michael Landon, who died of pancreatic cancer three years ago. From heartthrob Rob Lowe, her onetime fiancé, to her ex-husband, actor/playwright Bo Brinkman. And now Boxleitner."

Regarding Brinkman, the TV Guide article stated: "She turned around and married Brinkman in 1988 after knowing him only eight weeks. 'A bit hasty,' says Gilbert now. Their son was born in 1989. But the 4[-]1/2 year marriage floundered when Brinkman's drinking spiraled out of control. They separated, he went into rehab, they tried to reconcile. But, she says, 'We just grew apart.' "

Finally, the record contains a June 30, 1995, article from the Daily News with the headline, "Gilbert fires back at ex-husband, gossipy Enquirer." The article quoted Gilbert's lawyer regarding the filing of Gilbert's defamation and invasion of privacy lawsuit against Brinkman and the Enquirer. The attorney accused the Enquirer of having ignored her warning that the article on the Brinkman interview contained false statements about Gilbert. The article quoted Gilbert as stating, " 'I am heartbroken about this—and simply must put a stop to the lies.' "

## C. Procedural History

Gilbert's complaint, filed July 6, 1995, alleged five causes of action against Brinkman and the Enquirer for defamation, conspiracy to defame, false light invasion of privacy, conspiracy to commit false light invasion of privacy, and intentional infliction of emotional distress. The complaint prayed for compensatory and punitive damages of an unspecified sum.

In August 1995, Gilbert filed an amended complaint which added a sixth cause of action for injunctive relief against Brinkman. According to the new allegations, Brinkman had "threatened to reveal personal, private information about Melissa and their marriage unless Melissa dismisses Brinkman with prejudice from this action."

Without giving notice to Brinkman, Gilbert obtained an ex parte temporary restraining order (TRO) restricting Brinkman from revealing any information relating to Gilbert, whenever obtained, to anyone other than his

attorney.[1] In general, the TRO prohibited Brinkman from discussing, publishing, using, selling, communicating, distributing, revealing, disseminating, or divulging information concerning Gilbert's relationships with third parties, Gilbert's writings or diaries, their son Dakota, or matters filed under seal in this lawsuit. Gilbert also obtained an ex parte order sealing the record in this action pending the order to show cause (OSC) hearing regarding the issuance of a preliminary injunction.

In her declaration in support of the TRO, Gilbert stated that Brinkman had threatened to file a " 'really ugly' " cross-complaint if he was not dismissed from the lawsuit. She claimed that Brinkman had warned it would be " 'very painful' " for her if the press learned of his allegations. In Gilbert's words, those allegations concerned "very private, personal information about [Gilbert], [their] marriage and [their] relationship and [Gilbert's] private and personal relationships with third parties, some of which was true and some of which was false. The claims concerned drug and alcohol use as well as infidelity."

Gilbert further attested that injunctive relief was necessary to preserve her reputation "as a woman of the utmost honesty, integrity, sensitivity and propriety and a warm and loving mother. Because of this reputation, I continue to enjoy professional success, both creatively and commercially, and continue[] to enjoy the admiration and respect of millions of people around the world." While acknowledging the "substantial demand for information concerning [Gilbert's] personal and professional activities," Gilbert also pointed out that she and her publicist have tried to protect Dakota's privacy, as well as "the privacy of [Gilbert's] relationship with Brinkman, [their] relationship and the subsequent divorce."

In opposition to the OSC regarding the preliminary injunction, Brinkman contended that the TRO should not have been issued without notice, citing *Carroll* v. *Princess Anne* (1968) 393 U.S. 175, 180 [21 L.Ed.2d 325, 330-331, 89 S.Ct. 347]. He urged the court to deny the preliminary injunction as an unconstitutional prior restraint on his First Amendment free speech rights. Brinkman also cited numerous decisions for the proposition that injunctive relief is not available to restrain the commission of a libel or slander. He further pointed out that Gilbert had waived her right to privacy by previously exposing her private relationships to public scrutiny.

---

[1]Gilbert's attorney, Marcia J. Harris, explained in her declaration that Brinkman was not given notice because of the fear that he would disclose the information. Harris cited Code of Civil Procedure section 527, subdivision (c)(2)(C), California Rules of Court, rule 379, and Superior Court of Los Angeles County Rules, rule 9.37(e), as authority for the issuance of a TRO without notice to Brinkman.

Although not named in the sixth cause of action for injunctive relief, the Enquirer also opposed the preliminary injunction request. With regard to its standing, the Enquirer cited the right of "media entities . . . to challenge court-imposed restrictions on the speech rights of the litigants," even when they are not parties to the litigation. Like Brinkman, the Enquirer asserted the proposed preliminary injunction was an unconstitutional prior restraint on its and Brinkman's First Amendment rights. The Enquirer argued that Gilbert had failed to demonstrate the type of extraordinary circumstances necessary to impose a prior restraint. With regard to Gilbert's right to privacy, the Enquirer cited numerous decisions for the proposition that a feared invasion of privacy is not justification for a prior restraint.

In support of the issuance of the preliminary injunction, Gilbert asserted that the information which Brinkman was threatening to disclose concerned irrelevant events that had occurred prior to Dakota's conception. Gilbert characterized Brinkman's threatened disclosure as extortion, and contended that disclosure would expose her and her family to the danger of stalkers, invade her privacy, inflict emotional distress, and cause irreparable harm. While conceding the legitimate public interest in celebrities and their lives, Gilbert asserted the right to privacy must be balanced against the competing interests of a free press.

The trial court issued the preliminary injunction, precluding Brinkman from making any statements or disclosing any information, "(except to the minimum extent necessary insofar as disclosure is required by a court of competent jurisdiction in presenting defenses to the within action)," regarding Gilbert's drug or alcohol use, "obtained by Brinkman before, during and after his marriage to Gilbert and in the course of or as a result of his relationship with Gilbert." The preliminary injunction also precluded Brinkman from divulging "any information relating to any sexual or physical relationships between Gilbert and third parties." It also prohibited Brinkman from making any statements or disclosing any information to the Enquirer, outside the course and scope of preparing a defense against this lawsuit, and without a written agreement not to publish such information.

The court stated in its order of August 24, 1995, that the sixth cause of action did not involve "free press" issues, but rather concerned the threatened disclosure of private information obtained during the parties' marriage. The court stated that "due to the nature of the information obtained during the family fiduciary relationship, [Gilbert's] right of privacy outweighs [Brinkman's] right of free speech." In reaching this conclusion, the trial court expressed concern for Dakota's welfare, and also took judicial notice

of and disparaged "the growing and insatiable media culture in society whereby tremendous efforts are taken to obtain a[nd] publish very private information about people in general, and celebrities in particular. Oftentimes, little use is made of such private information and is obtained and disseminated for entertainment and commercial purposes only."

The order also pointed out that Brinkman was apparently judgment proof, and that Brinkman's motives for threatening to disclose the information included retaliation and financial gain. Under these circumstances, the court concluded in its order that the damage to Gilbert's and Dakota's privacy that would be inflicted by Brinkman's unrestrained speech justified the issuance of a preliminary injunction.

The trial court, however, refused to extend the protective order. The court stated in its order that Gilbert had waived her expected right of privacy by filing a lawsuit concerning private matters that must be revealed in order to resolve the dispute. Accordingly, the file in this action is no longer under seal.

The Enquirer petitioned for a writ of mandate and stay on September 6, 1995, and Brinkman filed a joinder to the petition on September 8, 1995. Amicus curiae Association of American Publishers, Inc., filed a brief on September 11, 1995. On September 15, 1995, we denied the petition on the ground that petitioners had failed to show that appeal was an inadequate remedy.

The Enquirer and Brinkman appealed from the preliminary injunction, and Gilbert appealed from the denial of her motion to seal the record. We granted the motions to expedite both the appeal and the cross-appeal.

## ISSUES

Brinkman and the Enquirer contend (I) the preliminary injunction must be reversed as an unconstitutional prior restraint, and (II) Gilbert has failed to establish a likelihood of success on the merits.

Gilbert contends (III) the court abused its discretion by denying her motion to seal the record.

DISCUSSION

I

■ We conclude the preliminary injunction is an unconstitutional prior restraint on Brinkman's and the Enquirer's First Amendment rights.

A. *Prior Restraints*

■ Prior restraints are disfavored and presumptively invalid. Circumstances more urgent than these have been adjudged insufficient to justify the imposition of a prior restraint. As noted by the California Supreme Court, even the publication of the purloined Pentagon Papers concerning matters of national security could not be restrained: "A recent case declined to restrain publication of the so-called 'Pentagon Papers' despite the urging of the government that the publication would result in a serious breach of national security (*New York Times Co.* v. *United States* (1971) 403 U.S. 713 . . .), and an attempt to restrain distribution of a pamphlet criticizing a real estate broker for his selling practices has likewise been held improper (*Organization for a Better Austin* v. *Keefe* (1971) 402 U.S. 415 . . . .)" (*Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 657-658 [119 Cal.Rptr. 468, 532 P.2d 116].)

In addition, prior restraints are not permitted to stop the publication of a defamatory statement. As our state Supreme Court put it, the published First Amendment cases "leave no doubt that the truth or falsity of a statement on a public issue is irrelevant to the question whether it should be repressed in advance of publication." (*Wilson* v. *Superior Court, supra,* 13 Cal.3d at p. 658.) "The concept that a statement on a public issue may be suppressed because it is believed by a court to be untrue is entirely inconsistent with constitutional guarantees and raises the spectre of censorship in a most pernicious form. [¶] Chief Judge Lumbard made this abundantly clear in *Crosby* v. *Bradstreet Company* (2d Cir. 1963) 312 F.2d 483, 485, cert. den., 373 U.S. 911 . . . , when he held that publication of information about a person, 'without regard to truth, falsity, or defamatory character of that information,' was not subject to prior restraint." (*Id.* at p. 659.)

Moreover, the California Constitution provides an even broader guarantee of the right of free speech and the press than does the First Amendment. (*Wilson* v. *Superior Court, supra,* 13 Cal.3d at p. 658.) California Constitution, article I, section 2, subdivision (a) provides, "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

Not all prior restraints are invalid, however. "The decisions recognize that prior restraints may be imposed under some extraordinary circumstances. For example, it has been said that the government may prohibit the disclosure of military secrets in time of war and prevent the utterance of words that may have the effect of force. (See, e.g., *Near* v. *Minnesota* [(1931)] 283 U.S. 697, 716 . . . .) Furthermore, an injunction restraining speech may issue in some circumstances to protect private rights (see, e.g., *Magill Bros.* v. *Bldg. Service etc. Union* (1942) 20 Cal.2d 506, 511-512 . . .) or to prevent deceptive commercial practices (*Securities and Exchange Com[m].* v. *Texas Gulf Sulphur Co.* (2d Cir. 1971) 446 F.2d 1301, 1306 ). However, we have not discovered any case upholding the power of a court to restrain publication of a statement regarding the official conduct of a public officer on the ground that the statement was not wholly true or was presented in a deceptive manner. The judiciary has been ever mindful of Thomas Jefferson's aphorism that 'error of opinion may be tolerated when reason is free to combat it.' " (*Wilson* v. *Superior Court, supra,* 13 Cal.3d at pp. 661-662.)

B. *The Preliminary Injunction*

 Gilbert disputes Brinkman's and the Enquirer's characterization of the preliminary injunction as an unconstitutional prior restraint. According to Gilbert, the preliminary injunction is "a legitimate restraint designed to maintain the sanctity of the former marital relationship between . . . Gilbert . . . and Brinkman." Gilbert contends her constitutional right of privacy outweighs the Enquirer's and Brinkman's First Amendment rights.

The scope of the preliminary injunction, however, is far broader than Gilbert contends. It applies to information concerning Gilbert's substance abuse and sexual relationships obtained at any time in the course of, or as a result of, Brinkman's relationship with Gilbert. It is not limited to communications made by Gilbert during the marriage.

As worded, the preliminary injunction covers information acquired, for example, as a result of Brinkman's joint custody relationship with Gilbert. The injunction would arguably cover comments made by Dakota to his father upon returning from his mother's home. The restriction, accordingly, is too broad. The "publication of information about a person, 'without regard to truth, falsity, or defamatory character of that information,' [is] not subject to prior restraint." (*Wilson* v. *Superior Court, supra,* 13 Cal.3d at p. 659.) While Brinkman maybe held responsible for abusing his right to speak freely in a subsequent tort action, he has the initial right to speak freely without censorship. (*In re Marriage of Candiotti* (1995) 34 Cal.App.4th 718,

724-725 [40 Cal.Rptr.2d 299]; *Dailey* v. *Superior Court* (1896) 112 Cal. 94, 97 [44 P. 458].)

In *In re Marriage of Candiotti, supra*, 34 Cal.App.4th 718, the appellate court reversed that part of an order banning the appellant in a family law custody and visitation proceeding from disseminating independently acquired information concerning her ex-husband's new wife. The appellate court upheld, however, that portion of the order banning dissemination of information acquired during discovery.

As to the independently acquired information, the court concluded that even though the appellant had no legitimate motivation for disseminating the potentially libelous information, the remarks were "too attenuated from conduct directly affecting the children to support a prior restraint on [the appellant's] constitutional right to utter them." (*In re Marriage of Candiotti, supra*, 34 Cal.App.4th at p. 726.) The order in *Candiotti* went beyond restraining one parent from making disparaging comments about the other parent in the presence of their children, which is a permissible order in family law cases (*id.* at p. 725). There was no justification, however, for preventing the appellant "from talking privately to her family, friends, coworkers, or perfect strangers about her dissatisfaction with her children's living situation." (*Ibid.*)

This case, unlike *Candiotti*, is not a child custody and visitation case. This is a defamation and invasion of privacy action that has nothing to do with determining who should have custody of the child. Even if this were a family law action, the preliminary injunction went beyond precluding Brinkman from making disparaging remarks about Gilbert in Dakota's presence. As in *Candiotti*, the order in this case restrained Brinkman from talking privately to family, friends, and coworkers about his dissatisfaction with Gilbert as a parent.

Moreover, this case involves a plaintiff who is a well-known actress. We cannot ignore the fact that Gilbert's publicist has sought media attention on her behalf. Numerous articles have been printed concerning her personal relationships, marriage, divorce, and remarriage. While public figures do not relinquish all privacy rights (*Eastwood* v. *Superior Court* (1983) 149 Cal.App.3d 409, 422 [198 Cal.Rptr. 342]), the heightened public interest in their personal activities is a factor to be weighed in balancing the competing interests.

In *Friedan* v. *Friedan* (S.D.N.Y. 1976) 414 F.Supp. 77, for example, the court noted that "[d]efendant Betty Friedan, as a leader of the feminist movement, is a public figure. All incidents of her life, including those which contrast with her present status and views, are significant in terms of the interest of the public in news. Thus, her connubial life and experience twenty-five years ago is a matter of public interest, and those who played a part in her life then may be referred to publicly." (*Id.* at pp. 78-79.)

The issue in *Friedan* was whether Ms. Friedan was entitled to summary judgment on her former husband's complaint, filed under a New York civil statute, for damages for the unauthorized use of his name and photograph in Ms. Friedan's magazine article describing her life in 1949 as a housewife. The court held that Ms. Friedan's use of the name and photograph had a newsworthy purpose and thus fell outside the scope of the statute, which dealt with unauthorized uses for purposes of trade or advertising. While the court acknowledged that Mr. Friedan had not gone out of his way "to make himself newsworthy, within the limited context of his past relationship to defendant Betty Friedan, who is a public figure, such a role has been thrust upon him." (414 F.Supp. at p. 79.)

Here, unlike in *Friedan*, the person seeking to avoid publicity is the public figure herself, not her ex-spouse. Public figures, however, must tolerate some criticism as the price of living in a free society. "Justice Frankfurter put it succinctly in *Baumgartner* v. *United States*, 322 U.S. 665, 673-674 . . . (1944), when he said that '[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures.' Such criticism, inevitably, will not always be reasoned or moderate; public figures as well as public officials will be subject to 'vehement, caustic, and sometimes unpleasantly sharp attacks,' *New York Times* [v. *Sullivan* (1964)] 376 U.S. [254,] 270, . . . '[T]he candidate who vaunts his spotless record and sterling integrity cannot convincingly cry "Foul!" when an opponent or an industrious reporter attempts to demonstrate the contrary.' *Monitor Patriot Co.* v. *Roy*, 401 U.S. 265, 274 . . . (1971)." (*Hustler Magazine* v. *Falwell* (1988) 485 U.S. 46, 51-52 [99 L.Ed.2d 41, 49, 108 S.Ct. 876].)

Brinkman contends he is attempting to set the record straight concerning prior articles which have cast him as the irresponsible alcoholic and Gilbert as the ideal mother. Gilbert has publicly blasted Brinkman's claims as lies. While their son is the unfortunate bystander in this feud, we are bound by decades of United States Supreme Court precedent on the law of prior restraints. The threatened invasion to Gilbert's right of privacy and the threatened harm to her reputation are not the sort of "extraordinary circumstances" required to justify a prior restraint. (*Wilson* v. *Superior Court*,

*supra*, 13 Cal.3d at p. 662.) Gilbert's remedy, if Brinkman or the Enquirer abuse their right of free speech and press, is to file a civil action for damages, as she has done here.

We hold, as a matter of law, that Gilbert's right to privacy does not outweigh Brinkman's right to express his uncensored opinion about her use of drugs and alcohol and her sexual relationships, or the Enquirer's right to publish that information, subject, of course, to possible civil liability for the abuse of those rights. We conclude the preliminary injunction is an invalid prior restraint that must be reversed.[2]

## II

In view of our determination in part I, we need not address the contention that Gilbert has failed to demonstrate a probability of success on the merits.

## III

Gilbert contends in her cross-appeal that the trial court abused its discretion by unsealing the record in this case.[3] She points out that having issued the preliminary injunction to protect her constitutional right of privacy, it was inconsistent of the court to create a " 'loophole' . . . by . . . unsealing . . . the records herein." She also points out that the trial court failed to balance her privacy interests against the Enquirer's right to publish and the public's interest in acquiring the information. She contends the trial court's failure to issue findings in this regard warrants a reversal of the order.

---

[2]At oral argument, Gilbert's attorney argued for the first time on appeal that the preliminary injunction could be justified as an injunction against the crime of extortion, and cited two new cases not mentioned in her briefs. (*Burnham Broadcasting Co.* v. *Williams* (La.Ct.App. 1993) 629 So.2d 1335; *U.S.* v. *Hutson* (9th Cir. 1988) 843 F.2d 1232.) We granted defendants additional time to file a letter brief in response to this new appellate contention, and stayed the submission of this matter until January 31, 1996.

Having considered defendants' letter brief of January 30, 1996, we conclude the preliminary injunction may not be justified as an injunction against the crime of extortion. The trial court never made a factual finding that Brinkman had committed or attempted to commit extortion. Had the trial court believed such a crime was committed, we doubt it would have unsealed the record and permitted Brinkman to file his cross-complaint (a copy of which was appended as an exhibit to defendant's January 30, 1996, letter brief). Accordingly, the record does not support Gilbert's position that Brinkman had committed or attempted to commit extortion.

[3]We reject the Enquirer's contention that the order is not appealable. While the order does not require the payment of money, it is a final order on a collateral issue. (Cf. *Brun* v. *Bailey* (1994) 27 Cal.App.4th 641, 648-649 [32 Cal.Rptr.2d 624].)

As Gilbert's contention suggests, the issues regarding the preliminary injunction and the sealing of the record are intertwined. Had we upheld the preliminary injunction, Gilbert's contention regarding the inconsistency of issuing injunctive relief while leaving the record open to public scrutiny would be more persuasive. As it stands, however, Gilbert's right to privacy does not outweigh Brinkman's right to express his uncensored opinion about her use of drugs and alcohol and her sexual relationships, or the Enquirer's right to publish that information. As we previously indicated, information concerning Gilbert's personal life is newsworthy due to her celebrity status, and in the context of his former marriage to Gilbert, Brinkman is also a newsworthy figure.

While Gilbert has not lost all of her privacy rights by virtue of attaining celebrity status, the media attention regarding her personal relationships has to some degree diminished the zone of privacy surrounding those relationships. ■ "[A] crucial ingredient of the tort premised upon the invasion of one's privacy is a public disclosure of *private facts* [citations], that is, the unwarranted publication of intimate details of one's private life which are outside the realm of legitimate public interest [citation]. In elaborating on the notion, the cases explain that there can be no privacy with respect to a matter which is already public [citation] or which has previously become part of the 'public domain' [citation]. Moreover, it is equally underlined that there is no liability when the defendant merely gives further publicity to information about the plaintiff which is already public or when the further publicity relates to matters which the plaintiff leaves open to the public eye [citation]." (*Sipple* v. *Chronicle Publishing Co.* (1984) 154 Cal.App.3d 1040, 1047 [201 Cal.Rptr. 665].)

■ Gilbert has failed to persuade us that this case falls under a specific exception that makes this court record nonpublic. As a general rule, ". . . court records are public records, available to the public in general, including news reporters, unless a specific exception makes specific records nonpublic. [Citation.]" (*Estate of Hearst* (1977) 67 Cal.App.3d 777, 782 [136 Cal.Rptr. 821], fn. omitted.)

In this case, if the court had extended the order sealing the record, the order would have operated as an unlawful prior restraint on the press for the reasons discussed above. Accordingly, Gilbert has failed to show that the trial court abused its discretion by lifting the sealing order.

## DISPOSITION

On the appeal, we reverse the order issuing the preliminary injunction and award costs to defendants. On the cross-appeal, we affirm the order denying the motion to seal the record in this case and award costs to defendants.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.