*1382
 
 Opinion
 

 HASTINGS, J.
 

 This matter arises from a discovery dispute and challenges an order compelling petitioner, Hunter Tylo, to answer questions at her deposition. Because the order compels discovery of information which potentially falls within a constitutionally protected interest, the right of privacy, we stayed the order and issued an order to show cause to review the matter.
 
 (Britt
 
 v.
 
 Superior Court
 
 (1978) 20 Cal.3d 844, 851-852 [143 Cal.Rptr. 695, 574 P.2d 766];
 
 Pacific Tel. & Tel. Co.
 
 v.
 
 Superior Court
 
 (1970) 2 Cal.3d 161, 170, fn. 11 [84 Cal.Rptr. 718, 465 P.2d 854];
 
 Palay
 
 v.
 
 Superior Court
 
 (1993) 18 Cal.App.4th 919, 925 [22 Cal.Rptr.2d 839].) After review, we issue a peremptory writ of mandate and order the trial court to reverse its order on certain questions.
 

 Statement of Facts
 
 [1]
 

 In February 1996, petitioner was a successful actress who regularly appeared in the daytime television show
 
 The Bold and the Beautiful.
 
 On February 16, 1996, petitioner entered into a contract with real parties in interest, Spelling Entertainment Group and Spelling Television, Inc. (real parties), to perform on the popular television series
 
 Melrose Place.
 
 The contract provided that petitioner would render “exclusive services in a recurring role for the 1996/97 series for a total of eight. . . episodes.” The contract also gave real parties the option to require petitioner to render exclusive services for another three years after the 1996/1997 series. Petitioner was informed that no specific character for her role had yet been written. The contract gave real parties the right of termination “if [petitioner] suffers any material change in [petitioner’s] appearance. . . .” Production was to begin in late June or early July 1996 for the 1996/1997 season.
 

 Relying on her new contract, petitioner announced her departure from
 
 The Bold and the Beautiful
 
 and her character was phased out of the show. Petitioner also turned down an opportunity for a test option role in the pilot for the Disney series
 
 Daytona Beach
 
 and turned down auditions for other pilots for the fall 1996/1997 season. In anticipation of her role on
 
 Melrose Place
 
 she received offers of several commercials and was negotiating possible roles in movies of the week.
 

 In mid-March 1996, petitioner learned that she was pregnant and requested that her business manager inform real parties “so that the writers of
 
 *1383
 
 ‘Melrose Place’ would have every opportunity to account for her pregnancy in developing her character, which had not yet been created.” On April 10, 1996, real parties informed petitioner that her contract was terminated “because this character is by necessity not pregnant. . . .”
 

 On May 13, 1996, petitioner filed a complaint against real parties alleging five separate causes of action. The first cause of action alleges employment discrimination on the basis she was terminated solely because of her pregnancy, citing Government Code section 12940 et seq. The second cause of action alleges wrongful termination in violation of public policy, discrimination based on sex. The third cause of action alleges breach of the employment contract asserting she could only be terminated for cause. The fourth cause of action alleges breach of the implied covenant of good faith and fair dealing. She contends real parties acted in bad faith “by not informing [petitioner] that not being pregnant was a condition of employment; by not informing her that if she became pregnant after signing the agreement that she would be terminated; by not discussing the circumstances surrounding her pregnancy with her; by not determining whether, if because of her pregnancy, she would require any accommodation, and by unilaterally terminating [petitioner’s] employment with the series ‘Melrose Place’ because of her pregnancy, without good cause and in bad faith.” The fifth cause of action is for negligent misrepresentation. The alleged negligent misrepresentation was twofold: that real parties did not inform petitioner “that they would not employ an actress who was pregnant or who later became pregnant to work on ‘Melrose Place’ ”; and that petitioner “would be employed for a minimum of eight . . . episodes on the series of ‘Melrose Place’ for the 1996/97 series, with the option to require [petitioner] to render exclusive services in the recurring role for an additional three . . . years, for an aggregate term of four . . . years.” Petitioner seeks damages for loss of earnings and employment benefits, loss of other employment opportunities, mental and emotional anxiety and distress, medical expenses, punitive damages, and attorney fees.
 

 Real parties answered the complaint with a general denial and listed a number of affirmative defenses, including the following: laches and unclean hands (second); estoppel “by reason of [petitioner’s] own actions and course of conduct” (third); waiver “by reason of [petitioner’s] own actions and course of conduct” (fourth); that petitioner’s reliance “on any alleged misrepresentations . . .” contained in the fifth cause of action was not justified (eleventh); and comparative negligence as to the fifth cause of action (fourteenth).
 

 Real parties noticed and took the deposition of petitioner. On the advice of counsel, she refused to answer a number of questions relating to her relationship with her husband, Michael Tylo, and questions regarding her attempts to become pregnant. Real parties brought a motion to compel answers
 
 *1384
 
 to these questions, which the court granted over petitioner’s objections based on relevance and the right to privacy.
 

 Further facts are contained in the discussion.
 

 Discussion
 

 “Would we allow the police to search the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives? The very idea is repulsive to the notions of privacy surrounding the marriage relationship. [<U We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions.”
 
 (Griswold
 
 v.
 
 Connecticut
 
 (1965) 381 U.S. 479, 485-486 [85 S.Ct. 1678, 1682, 14 L.Ed.2d 510].)
 

 Questions regarding the subject of petitioner’s marital
 
 relationship
 
 [2]
 

 Petitioner’s deposition was taken on July 16,1996. Early in the deposition petitioner was asked whether she had undergone “any type of psychiatric or psychological treatment” in the past five years. She responded in the affirmative, identified the psychologist, and then stated that she had treated with him for a couple of years beginning in 1991 “and then nothing, and then briefly probably maybe three visits in ’94.”
 

 A bit later in the deposition the questions turned to petitioner’s relationship with her husband and potential emotional distress arising from that relationship: “Q. By Mr. Waldo: What year did you marry Michael Tylo? [•JD A. 1987. [H Q. Was he diagnosed with cancer in the past 10 years? [f] A. No. [*][] Q. Was he diagnosed with any serious illness in the past ten years? [H A. There was a threat of something at one point. [^Q Q. There was the threat of what? [JO Ms. Leal [counsel for petitioner]: Objection. It invades Mr. Tylo’s constitutional right to privacy and I’m going to instruct her not to answer. [<][] Q. Mr. Waldo: How would you characterize the health of your marriage to Michael Tylo? [‘JQ A. It is perfect. [<U Q. And has it been perfect for all of 1996? [1 A. Yes. HQ Q. Was it perfect for all of 1995? [1 A. Yes.”
 

 At this point, the first of a series of questions which are the subject of this writ proceeding was asked: “Q. And was it perfect for all of 1994?” The
 
 *1385
 
 following exchange then took place: “Ms. Leal: Hold on a second. Don’t answer this. HD Where are you going with this? What’s the relevance of all this? [c[0 Mr. Waldo:
 
 Counsel, if you don’t know your case, I am not going to give you my theory of my case simply because you don’t know your case.
 
 [*]□ Ms. Leal: I know my case, Mr. Waldo. The problem I’m having with the questions you’re posing is that they’re violative of my client’s constitutional right to privacy and that of Michael Tylo’s, so unless you want to lay a record here— [f] Mr. Waldo: I’ll lay a record for you. In about 10 or 12 places in your Complaint, you’ve accused my clients of engaging in vicious conduct that inflicted serious, severe emotional distress on your witness. [*]Q I’m going through psychological stressors listed in the DSM-IV as alternate possible grounds for problems. If you’re going to tell me I can’t do that, then we’ll make a motion to strike these damage claims or you can withdraw them now, and if you withdraw them now, this line of inquiry will stop. Ms. Leal: Let me suggest something, Mr. Waldo. The allegations made in the Complaint are that your client violated the law and engaged in other conduct in 1996. Now, what occurred in 1995, what occurred in 1994, what occurred in 1993, ’92 and ’91, what you’ve been asking about is completely irrelevant. Not only is it irrelevant, but it also invades my client’s constitutional right to privacy and that of her husband’s, [f] Now, if you want to ask her whether in 1995, whether in 1994 there were circumstances that might have caused her emotional distress that she is still currently still suffering from, that’s a different story. Then I might allow her to answer that particular question. [H Mr. Waldo:
 
 Let’s just go and why don’t you give instructions not to answer and we’ll let a judge figure it out later.”
 
 (Italics added.)
 

 The questions and objections then continued: “Q. Would you characterize your marriage to Michael Tylo in 1994 as perfect? [1] Ms. Leal: Objection. Same grounds. Don’t answer, [f . . . [1 Q. Would you characterize your marriage to Michael Tylo in 1993 as perfect? [^] Ms. Leal: Same objection. Same instruction. [^Q Q. Would you characterize your marriage to Michael Tylo in 1992 as perfect? [*j0 Ms. Leal: Same objection. Same instruction. [^Q Q. Would you characterize your marriage to Michael Tylo in 1991 as perfect? [^Q Ms. Leal: Same objection. Same instruction.”
 

 Next, the following exchange took place: “Q. By Mr. Waldo: Have you at any time sought psychiatric or psychological treatment because of marital problems with Michael Tylo in the past five years? [C[D A. Yes. [‘jfl Q. When? [<J[] A. Probably I believe it was September of ’94. [H Q. And from whom did you seek this psychiatric or psychological treatment? [f] A. Dr. Crowley. [f| Q. Was there a specific event or events that caused you to seek this
 
 *1386
 
 psychological treatment? [10 Ms. Leal: Wait a minute. Hold on a second. I’m going to object. I’m going to object on the same grounds: That it invades my client’s constitutional right to privacy as well as Mr. Tylo’s who is not a party to this action. HD . . . [10 I’m instructing her not to answer. [10 Q. You abandoned your husband and went to India in 1994, didn’t you? [ID Ms. Leal: Objection. Relevance; invades my client’s constitutional right to privacy and Mr. Tylo’s to the extent that— [10 Mr. Waldo: Look at, Counsel. I’m talking about matters of public record. Your client gave interviews to various media where she said these things, okay. [10 Ms. Leal: You believe everything you read that the media prints, Mr. Waldo? [10 Mr. Waldo: All I’m saying is that before you make claims to privacy, you better be dam sure your client was misquoted in— [DO Ms. Leal: Why don’t you ask her if she’s told ABC, a reporter, X, Y and Z if she recalls— [10 Mr. Waldo: I’m not going to go through my list— [IQ Ms. Leal: —then she can answer that. [ID Mr. Waldo: —of your client’s interviews in the media because it’s very extensive and obviously you haven’t done it and I’m not going to waste time here.
 
 Just give the instructions and we’ll go to court and you can be told how to conduct yourself at a deposition because you don’t know your case.
 
 [10 Ms. Leal: Please don’t be raising your voice. [10 Mr. Waldo: I’m not raising my voice.
 
 You don’t know your case and that’s apparent.
 
 [ID
 
 Would you like to talk to your client
 
 outside? [IQ Ms. Leal: No, I don’t need to talk to my client outside. [ID Mr. Waldo: Fine. [10 Ms. Leal: And I resent the fact that you’re telling me I don’t know my case. [ID Mr. Waldo:
 
 You don’t.”
 
 (Italics added.)
 
 [3]
 

 Real parties contend that because petitioner is seeking emotional distress damages in her suit, they have a right to discover “other stressors that
 
 might
 
 have caused, or contributed to, [petitioner’s] alleged emotional injuries,” including any emotional distress resulting from her marriage. (Italics added.) They cite and quote from Code of Civil Procedure section 2017, subdivision (a): “[A]ny party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action ... if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence. Discovery may relate to the claim or defense of the party seeking discovery. . . .” Real parties also cite
 
 Greyhound Corp.
 
 v.
 
 Superior Court
 
 (1961) 56 Cal.2d 355, 384-385 [15 Cal,Rptr. 90, 364 P.2d 266], for the proposition that “fishing expeditions” are permitted.
 

 
 *1387
 
 Petitioner’s objections are grounded upon the constitutional right to privacy contained within article I, section 1 of the California Constitution. Therefore, real parties’ argument relating to the scope of discovery and the ability to undertake a fishing expedition misses the mark. While the filing of the lawsuit by petitioner may be something like issuing a fishing license for discovery, as with a fishing license, the rules of discovery do not allow unrestricted access to all species of information. Discovery of constitutionally protected information is on a par with discovery of privileged information and is more narrowly proscribed than traditional discovery.
 
 {Britt
 
 v.
 
 Superior Court, supra,
 
 20 Cal.3d at pp. 852-853.)
 

 “When the right to discovery conflicts with a privileged right, the court is required to carefully balance the right of privacy with the need for discovery. [Citations.]”
 
 (Harris
 
 v.
 
 Superior Court
 
 (1992) 3 Cal.App.4th 661, 665 [4 Cal.Rptr.2d 564].) Discovery may be compelled only upon a showing of a compelling public interest.
 
 {Id.
 
 at p. 664.) In those situations where it is argued that a party waives protection by filing a lawsuit, the court must construe the concept of “waiver” narrowly and a compelling public interest is demonstrated only where the material sought is
 
 directly relevant
 
 to the litigation.
 
 {Britt
 
 v.
 
 Superior Court, supra,
 
 20 Cal.3d at pp. 858-859.) The party seeking the constitutionally protected information has the burden of establishing that the information sought is directly relevant to the claims.
 
 {Harris
 
 v.
 
 Superior Court, supra,
 
 3 Cal.App.4th at p. 665.)
 

 One of the issues in
 
 Britt
 
 v.
 
 Superior Court,
 
 as in this case, was the compelled disclosure of psychological information sought on the theory that the action alleged emotional distress. The Supreme Court concluded that the trial court’s order was overly broad and reiterated the narrow scope of discovery allowed: “Accordingly, we held in Lifschutz[
 
 4
 
 ] that ‘the “automatic” waiver of privilege contemplated by [the patient-litigant exception] must be construed not as a complete waiver of the privilege but only as a limited waiver concomitant with the purposes of the exception. Under section 1016 disclosure can be compelled only with respect to
 
 those mental conditions
 
 the patient-litigant has “disclose[d] ... by bringing an action in which
 
 they
 
 are in issue” [citation]; communications which are not directly relevant to those specific conditions do not fall within the terms of section 1016’s exception and therefore remain privileged. Disclosure cannot be compelled with respect to other aspects of the patient-litigant’s personality even though they may, in some sense, be “relevant” to the substantive issues of litigation. The patient thus is not obligated to sacrifice all privacy to seek redress for a specific mental or emotional injury; the scope of the inquiry permitted depends upon the nature of the injuries which the patient-litigant himself has
 
 *1388
 
 brought before the court. ’ ”
 
 (Britt
 
 v.
 
 Superior Court, supra,
 
 20 Cal.3d at pp. 863-864.)
 

 The same concept applies to this action. There can be no doubt that the marital relationship serves as a foundation for an assertion of the right to privacy, and real parties do not claim otherwise. Petitioner has tendered her psychological condition in this litigation only as it relates to termination of the employment contract. Therefore, discovery is limited to those injuries resulting from termination of the contract. Before real parties can obtain information regarding emotional distress from the marital relationship, they must first identify the specific emotional injuries which petitioner claims resulted from termination of the contract and then demonstrate there is a nexus between damages from termination and those which may arise out of the marital relationship. Real parties have failed to do either. They merely assert the conclusion that there are “other stressors that
 
 might
 
 have caused, or contributed to, [petitioner’s] alleged emotional injuries,” a true fishing expedition. (Italics added.)
 

 Real parties also contend that petitioner has waived her right of privacy because she is a public figure and stories have been placed in numerous publications relating to her marital difficulties, citing
 
 Gilbert
 
 v.
 
 National Enquirer, Inc.
 
 (1996) 43 Cal.App.4th 1135 [51 Cal.Rptr.2d 91]. While
 
 Gilbert
 
 does discuss the fact that public figures may have lessened expectations of privacy, it recognizes that “. . . public figures do not relinquish all privacy rights
 
 (Eastwood
 
 v.
 
 Superior Court
 
 (1983) 149 Cal.App.3d 409, 422 [198 Cal.Rptr. 342]).”
 
 (Gilbert
 
 v.
 
 National Enquirer, Inc., supra,
 
 43 Cal.App.4th at p. 1146.)
 
 Gilbert
 
 is not a discovery case, but one involving injunctive relief, which the court found to be a prior restraint in contravention of the First Amendment to the United States Constitution. (43 Cal.App.4th at pp. 1144-1148.) While the court did confront the plaintiff’s right to privacy in connection with her request that the court file be sealed, it noted that the right of privacy issue was intertwined with the prior restraint issue: “Had we upheld the preliminary injunction, [plaintiff’s] contention regarding the inconsistency of issuing injunctive relief while leaving the record open to public scrutiny would be more persuasive. As it stands, however, [plaintiff’s] right to privacy does not outweigh [her ex-husband’s] right to express his uncensored opinion about her use of drugs and alcohol and her sexual relationships, or the [publication’s] right to publish that information. As we previously indicated, information concerning [plaintiff’s] personal life is newsworthy due to her celebrity status, and in the context of his former marriage to [plaintiff], [her ex-husband] is also a newsworthy figure.”
 
 (Id.
 
 at p. 1149.)
 

 We have no issue of prior restraint in this case and no competing constitutional right has been called into play under the facts presented by
 
 *1389
 
 real parties. While petitioner does not challenge the contention that she is a public figure as a consequence of her celebrity status, she has not relinquished all rights of privacy for purposes of discovery. As previously noted, the court must narrowly construe an assertion of waiver. The mere fact that the media publishes articles about a public figure does not qualify the material as relevant to the subject matter of the litigation for purposes of discovery. This is especially true where articles relied upon are remote to the issue presented in the litigation.
 

 In support of the claim of waiver on these issues, real parties attached five articles dated from May 19, 1994, to July 14, 1994, quoting Michael Tylo to the effect he and petitioner are divorcing. There is one article dated June 8, 1994, which attributes a statement to petitioner on the subject. There is one article, undated, but apparently around the time she was leaving
 
 The Bold and the Beautiful
 
 for
 
 Melrose Place
 
 in which petitioner stated that her home life was “serene.” All but one of these articles pre-date this litigation by almost two years. The only article which appears to be current, describes her home life as “serene.” More fundamentally, the fact that a journal prints an article attributing a statement to a party is not proof that the party made the attributed statement.
 

 We conclude that no waiver resulted from these articles and that real parties failed to carry their burden of proof in the trial court to demonstrate a compelling public interest, that the information requested is directly relevant to this action. The order relating to these questions must be reversed.
 

 Questions relating to petitioner’s pregnancy
 

 These questions are as follows:
 

 “Q. Have you and your husband been attempting to get pregnant for any lengthy period of time?
 

 “Ms. Leal: Same instruction. Same objection.
 

 “Q. Did you consider your pregnancy to be accidental or was it something that you and your husband were attempting to accomplish?
 

 “Ms. Leal: Same instruction. Same objection.
 

 “Q. Did you ever tell Mr. Dauer [her agent] that you could not believe that you got pregnant when you did?
 

 
 *1390
 
 “Ms. Leal; Same objection. Same instruction.
 

 “Q. Now, did you ever tell Mr. Dauer that your husband had a vasectomy?
 

 “Ms. Leal: Don’t answer the question. It’s irrelevant. He can ask Mr. Dauer what you purportedly told him and we can deal with that—
 

 “Q. Did you ever instruct Mr. Dauer not to tell anyone that your husband had a vasectomy?
 

 “Ms. Leal: Objection. Same objection. Same instruction.
 

 “Q. Did you ever tell Mr. Dauer that your husband had a vasectomy reversal?
 

 “Ms. Leal: Same objection. Same instruction.
 

 “Q. Did your husband have a vasectomy?
 

 “Ms. Leal: Objection. Relevance and it also invades [petitioner’s] constitutional right to privacy, and I am instructing her not to answer.
 

 “Q. Did your husband have a vasectomy reversal?
 

 “Ms. Leal: Same instruction. Same grounds.
 

 “Q. When did your husband have a vasectomy reversal?
 

 “Ms. Leal: Same grounds. Same instruction.”
 

 The subject matter of these questions also falls directly within the right to privacy, and real parties must demonstrate a compelling public interest for the information. In an attempt to do so real parties argue that the information sought is relevant to the cause of action for negligent misrepresentation. The argument focuses on the allegation that real parties failed to advise petitioner that it was their policy not to employ pregnant women to work on
 
 Melrose Place,
 
 referencing the issues of materiality and reliance.
 

 On the issue of materiality, real parties argue that in order for petitioner to succeed on her claim of nondisclosure she must prove the failure to disclose was material; if she was trying to get pregnant then the failure to disclose the policy “arguably would be material.” On the other hand, real parties concede that if she was not trying to become pregnant then the information “arguably would not be material.”
 

 
 *1391
 
 On the issue of reliance, the argument proceeds as follows: Petitioner was aware of the industry standard that provides a clause for cancellation if there is a material change in physical appearance; if petitioner was trying to become pregnant at the time the contract was being negotiated she could have expected pregnancy to effect a material change in her appearance; therefore, her reliance on the failure to disclose would have been unreasonable.
 

 We agree there is a nexus between petitioner’s state of mind relating to her pregnancy and the fifth cause of action for negligent misrepresentation. However, that does not mean any and all questions relating to the circumstances of conception or the sex life of petitioner and her husband are appropriate. Her knowledge of her husband’s ability to impregnate her and attempts to become pregnant during the time she was negotiating the contract are relevant. Therefore, whether she knew about a vasectomy obtained by her husband, or reversal of the vasectomy, is relevant. Statements made to Mr. Dauer relating to the issue would also be relevant. However, questions which go far afield from the actual issues to be litigated are not appropriate. The question which asked “Have you and your husband been attempting to get pregnant for any lengthy period of time?” is vague because it may encompass a period of time greater than the subject matter of the litigation. To the extent the question which asked “Did you consider your pregnancy to be accidental?” relates to the pregnancy which resulted in termination of the contract, it is appropriate; otherwise it is overly broad.
 

 We conclude that the court did not err in ordering petitioner to answer questions along this line as long as they relate to the specific subject matter tendered in the litigation. We are not given an actual order issued by the trial court but it is clear from the reporter’s transcript that the court understood the limitation: “Okay. All right. I think, obviously, this is a fairly obtrusive discovery, but it goes to the main issue as to (a) her emotional state, (b) what she knew at the time she was negotiating, (c) whether or not, for example, if she knew that this character that she was being hired to portray was not to be pregnant, and after they concluded or during the negotiations, she was taking some steps to make that contract nonperformable, I think that goes to the heart of the issue.”
 

 Disposition
 

 Let a writ issue directing the trial court to set aside that part of the order granting real parties’ motion on the questions relating to emotional distress arising out of the marital relationship and to enter a new order denying that
 
 *1392
 
 part of the motion. Otherwise, the order of the court will stand. Costs are awarded to petitioner.
 

 Epstein, Acting P. J., and Aranda, J.,
 
 *
 
 concurred.
 

 The petition of real parties in interest for review by the Supreme Court was denied October 1, 1997.
 

 [1]
 

 The underlying facts have been taken from the pleadings which provide the “subject matter” against which we measure the discovery issues addressed. (Code Civ. Proc., § 2017, subd. (a).)
 

 [2]
 

 The specific questions at issue are set out in bold.
 

 [3]
 

 At best, the comments of Mr. Waldo set out in italics were in poor taste. At worst, they were an attempt to intimidate opposing counsel and her client. In either case, they were unprofessional and inappropriate. Unfortunately, it appears that such tactics are being exhibited more frequently now than in the past. Professionalism and civility are attributes still valued in the practice of law.
 

 [4]
 

 In re Lifschutz
 
 (1970) 2 Cal.3d 415 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1].
 

 *
 

 Judge of the Municipal Court for the South Bay Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.