Filed 1/25/16  Baez v. Burbank Unified School Dist. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| DANIELLE BAEZ, | B254852 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC372092) |
| v. | |
| BURBANK UNIFIED SCHOOL DISTRICT et al. | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary Ann Murphy, Judge.  Affirmed as modified.

Doumanian & Associates and Nancy P. Doumanian; Greines, Martin, Stein & Richland, Timothy T. Coates, and Alison M. Turner for Defendants and Appellants.

Pine & Pine, Norman Pine, and Scott Tillett; Law Offices of Victor L. George, Victor L. George, and Wayne C. Smith for Plaintiff and Respondent.

_____

Respondent Danielle Baez filed this action against her former employer, appellant Burbank Unified School District, and the District's former Chief Facilities Officer, appellant Craig Jellison. Following a third trial on Baez's claims, the jury found in favor of Baez on her cause of action for sexual harassment in violation of the California Fair Employment and Housing Act, Gov. Code § 12900 et seq. (FEHA). On appeal, the District and Jellison argue that the trial court erred in admitting evidence concerning an investigation of Baez's sexual harassment complaint by the District's outside counsel, and in excluding evidence of Baez's marital problems as a potential alternative cause of her alleged damages. The District and Jellison also assert that the trial court erred in awarding attorney's fees to Baez for the hours expended by her counsel in the first trial, and in awarding expert witness fees to Baez as a recoverable cost under FEHA. We modify the judgment to correct the post-judgment interest rate, but otherwise affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

### I. The Pleadings

Baez filed suit against the District and Jellison in June 2007. Among other claims, Baez alleged a cause of action against both the District and Jellison for hostile work environment harassment in violation of FEHA. She also alleged causes of action against Jellison for battery, false imprisonment, and intentional infliction of emotional distress. The gravamen of Baez's first amended complaint was that Jellison began pursuing her in December 2005 with the intent of engaging in an extramarital affair, and then sexually assaulted her in his office in July 2006 after she repeatedly rebuffed his advances. Baez sought compensatory damages, attorney's fees, and costs of suit.

---

[1] Baez's action against the District and Jellison has been the subject of two prior proceedings in this court. (*Baez v. Superior Court* (Dec. 17, 2008, B208294) [nonpub. opn.]; *Baez v. Burbank Unified School District* (May 7, 2012, B219581) [nonpub. opn.].) A portion of the factual and procedural background in the present appeal is taken from these prior opinions.

The District and Jellison filed an answer to Baez's first amended complaint in April 2008. In their affirmative defenses, the District and Jellison denied that Jellison was Baez's supervisor, and that Baez had been subjected to unwanted harassing conduct. They also asserted that Baez had engaged in an inappropriate sexual relationship with her direct supervisor, Steve Bradley, during her employment, and only raised a complaint of harassment against Jellison when she became the subject of a workplace investigation of her improper conduct with Bradley. The District and Jellison further asserted that the District properly and timely investigated Baez's sexual harassment complaint and took reasonable steps to prevent any harassment from occurring.

In addition to its answer, the District filed a cross-complaint against Baez for fraud, concealment, and implied indemnity. The gravamen of the cross-complaint was that Baez falsely had represented that she was disabled from working between March and November 2007, and that based on such representation, she was granted a paid medical leave of absence from the District while she worked at another job. The District sought to recover all wages and benefits that it had paid to Baez during her leave of absence, along with attorney's fees and costs of suit.

## II.  The First Trial

The case originally was tried to a jury in June 2009. Prior to the start of trial, Baez filed a motion in limine to exclude evidence of her sexual conduct with any person other than Jellison, including evidence of an extramarital affair that she had with her former supervisor, Steve Bradley. Baez also moved to exclude evidence of a miscarriage she had suffered in September 2006. The District and Jellison opposed the motions on the ground that Baez's sexual relationship with Bradley was relevant to her credibility and motive for alleging a harassment claim against Jellison.[2] They also argued that Baez's

---

[2]    As alleged by the District and Jellison, Baez's extramarital affair with Bradley was reported to Jellison in November 2006 by a custodial employee who saw the couple together in a District office. Jellison in turn reported the affair to the District because one or more custodial employees under his supervision had been threatened by Baez and

3

marital infidelity and any resulting pregnancy were relevant to her alleged damages. The trial court denied the motions in limine. The court ruled that evidence of Baez's affair with Bradley was admissible under Evidence Code section 1106[3] to rebut Baez's claim that Jellison had sexually assaulted her and to show that Baez may have manufactured the claim against Jellison to deflect attention from the District's investigation of the affair. The court also ruled that the jury could hear evidence related to Baez's miscarried pregnancy, which the District and Jellison had insinuated was a result of her relationship with Bradley. Following these rulings, the District and Jellison presented extensive evidence of Baez's extramarital affair with Bradley to the jury.

At the conclusion of the first trial, the jury returned a special verdict in favor of the District and Jellison on Baez's first amended complaint, finding that Baez had not been subjected to any unwanted harassing conduct by Jellison. The jury also found in favor of the District on its cross-complaint and awarded the District compensatory damages in the amount of $18,565.01 and punitive damages in the amount of $1. Following the verdict, Baez filed a motion for a new trial based on the allegedly erroneous admission of the

Bradley in an attempt to cover up their affair. Baez first made a sexual harassment complaint against Jellison in February 2007 during the District's investigation of her inappropriate relationship with Bradley.

[3]     Evidence Code section 1106 provides: "(a) In any civil action alleging conduct which constitutes sexual harassment, sexual assault, or sexual battery, opinion evidence, reputation evidence, and evidence of specific instances of plaintiff's sexual conduct, or any of such evidence, is not admissible by the defendant in order to prove consent by the plaintiff or the absence of injury to the plaintiff, unless the injury alleged by the plaintiff is in the nature of loss of consortium. [¶] (b) Subdivision (a) shall not be applicable to evidence of the plaintiff's sexual conduct with the alleged perpetrator. [¶] (c) If the plaintiff introduces evidence, including testimony of a witness, or the plaintiff as a witness gives testimony, and the evidence or testimony relates to the plaintiff's sexual conduct, the defendant may cross-examine the witness who gives the testimony and offer relevant evidence limited specifically to the rebuttal of the evidence introduced by the plaintiff or given by the plaintiff. [¶] (d) Nothing in this section shall be construed to make inadmissible any evidence offered to attack the credibility of the plaintiff as provided in Section 783." Unless otherwise stated, all further statutory references are to the Evidence Code.

4

evidence of her extramarital affair. The motion was supported by declarations from jurors who stated that a significant portion of the deliberations was devoted to the Baez-Bradley affair, including speculation about the father of Baez's miscarried fetus. During the deliberations, some of the jurors also made statements to the effect that, because Baez had "slept with her boss," she was not credible and that "whatever happened in Jellison's office was consensual." The trial court denied the motion for a new trial.

Baez filed an appeal from the judgment entered in the first trial. In an unpublished opinion, this court held that the trial court erred in admitting the evidence of Baez's extramarital affair with Bradley. We concluded that the evidence was not properly admitted under section 1106 to show an alternative source of Baez's damages because Baez did not seek damages for loss of consortium or other special damages arising from Jellison's conduct. We also concluded that the evidence was not properly admitted to attack Baez's credibility or motive for alleging that Jellison had sexually harassed her. We explained that, under section 1106, subdivision (d), a defendant seeking to present evidence of a plaintiff's sexual conduct to attack his or her credibility must first file a written motion and make an offer of proof of the relevancy of the proffered evidence pursuant to section 783.[4] However, neither the District nor Jellison made such a motion.

---

[4] Section 783 provides: "In any civil action alleging conduct which constitutes sexual harassment, sexual assault, or sexual battery, if evidence of sexual conduct of the plaintiff is offered to attack credibility of the plaintiff under Section 780, the following procedures shall be followed: [¶] (a) A written motion shall be made by the defendant to the court and the plaintiff's attorney stating that the defense has an offer of proof of the relevancy of evidence of the sexual conduct of the plaintiff proposed to be presented. [¶] (b) The written motion shall be accompanied by an affidavit in which the offer of proof shall be stated. [¶] (c) If the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury, if any, and at the hearing allow the questioning of the plaintiff regarding the offer of proof made by the defendant. [¶] (d) At the conclusion of the hearing, if the court finds that evidence proposed to be offered by the defendant regarding the sexual conduct of the plaintiff is relevant pursuant to Section 780, and is not inadmissible pursuant to Section 352, the court may make an order stating what evidence may be introduced by the defendant, and the nature of the questions to be permitted. The defendant may then offer evidence pursuant to the order of the court."

5

We also explained that the record did not support the District's contention that the evidence was admissible to show that Baez had fabricated a sexual harassment claim to deflect attention from her improper relationship with Bradley because there was no indication that Baez perceived the District's investigation of that relationship would be abandoned or undermined in any way based on her claim that Jellison had harassed her. Based on the totality of the record, we concluded that "considerable evidence was admitted which should not have been admitted upon a proper consideration under Evidence Code section 783 and [section] 1106." We therefore reversed the judgment and remanded the matter to the trial court for a new trial.

## III.    The Second Trial[5]

Prior to the start of the second trial, the District and Jellison filed a motion to permit the introduction of evidence concerning Baez's extramarital affair with Bradley pursuant to section 783. At the hearing on the motion, counsel for the District and Jellison argued that the evidence was relevant to challenging Baez's credibility, including her character for honesty and motive for alleging a sexual harassment complaint, and to disproving her claim for emotional distress damages. With respect to damages, defense counsel asserted that, because Baez was claiming that Jellison's alleged sexual assault had caused problems in her marriage, evidence of her extramarital affair with Bradley was relevant to proving that any marital discord was attributable to Baez's affair rather than Jellison's conduct. In response, Baez's counsel advised the trial court that Baez would not present any evidence about the effect that Jellison's alleged conduct had on her marriage or seek to recover damages for any marital discord that she had experienced.

The trial court denied the section 783 motion. The court concluded that evidence of a consensual affair between Baez and Bradley was not relevant to Baez's credibility or damages, and that any probative value of the proffered evidence was substantially

---

[5]    Los Angeles County Superior Court Judge Joanne O'Donnell presided over the first trial. Prior to the start of the second trial, the case was reassigned to Los Angeles County Superior Court Judge Mary Ann Murphy.

outweighed by risk of undue prejudice under section 352. In response to the trial court's ruling, defense counsel asserted that, even if the witnesses could not explicitly refer to the affair at trial, they should be allowed to testify that there were events in Baez's life other than the alleged assault by Jellison that caused her emotional distress. The trial court rejected this argument, stating: "There's not going to be any reference to the affair with Bradley, explicitly, implicitly, fleetingly or any other way and that includes other stressors. That's the ruling." The court made clear that it did not "want to hear the word 'Bradley' in this trial unless [it had] preapproved it," and that prior to any trial testimony, the court "want[ed] each and every witness advised of what [its] in limine orders are."

Following the denial of the section 783 motion, counsel for the District and Jellison sought guidance from the trial court on the admissibility of certain testimony in light of its evidentiary ruling. The court indicated that the defense could offer testimony that Baez was being investigated for workplace misconduct prior to making a harassment complaint against Jellison, but ordered that any testifying witness should refer to such misconduct solely as an unrelated personnel matter involving Baez and an unnamed District employee. The court also reiterated that the defense was not allowed to present testimony that Baez had "other stressors" in her life unrelated to Jellison where those stressors implicitly referred to her affair with Bradley. The court emphasized that, pursuant to its in limine rulings, "counsel and their witnesses will not refer to the prior trial in this action . . . [and] will not refer to the affair between [Baez] and Mr. Bradley implicitly or explicitly."

The case was tried to a jury a second time starting on October 10, 2013. On the third day of testimony, Baez moved for a mistrial on the ground that defense counsel repeatedly had violated the trial court's in limine orders, including its order prohibiting any reference to the Baez-Bradley affair. After reviewing the record and hearing the arguments of counsel, the trial court granted the motion.

As noted by the trial court, defense counsel improperly stated numerous times in her opening statement that Baez had committed serious misconduct in the workplace, including making threats against a custodial employee. During her examination of Sukhi

7

Sandhu, an attorney for the District who investigated Baez's sexual harassment complaint against Jellison, defense counsel repeatedly elicited testimony from Sandhu that she initially was retained to investigate misconduct that had been committed by both Baez and Bradley, which included Baez threatening a custodial employee who had witnessed some of the misconduct. Defense counsel also elicited testimony from Sandhu that her investigative file was larger than her report on Baez's sexual harassment complaint against Jellison, but she could not explain to the jury where the rest of her file was without violating the court's order. Outside the presence of the jury, Sandhu admitted the rest of her file related to the Baez-Bradley affair. Sandhu also directly referenced the first trial in responding to a question by Baez's counsel, and later confirmed to the trial court that defense counsel never advised her of the order prohibiting any such reference. Based on the totality of the record, including defense counsel's refusal to acknowledge that any in limine orders had been violated, the trial court concluded that declaring a mistrial was the only proper remedy.

## IV.    The Third Trial

The case was tried to a jury a third time commencing on October 18, 2013 and concluding on November 12, 2013. A summary of the evidence presented to the jury in the third trial is set forth below.

### A.    The Evidence At Trial

Baez was employed by the District as a senior administrative secretary. Her direct supervisor in this position was Bradley, the District's Assistant Superintendent of Business. As part of her job duties, Baez also performed some work assignments for Jellison, the District's Chief Facilities Officer. According to Baez, she initially had a friendly relationship with Jellison. They frequently had lunch together with other District employees, and conversed on the telephone outside of work. At some point, however, their relationship changed as Jellison began expressing a romantic interest in Baez even though they were both married. In December 2005, Jellison started to send Baez sexually suggestive emails which became increasingly explicit in nature. Jellison also told Baez

8

that he had romantic feelings for her. At times, Baez sent friendly or flirtatious responses to Jellison's emails. On other occasions, Baez ignored the emails or explained to Jellison that she only wanted a friendship with him. Baez admitted, however, that she was not offended by any of Jellison's emails, and that, prior to July 26, 2006, Jellison had not engaged in any other conduct that offended her.

Baez testified that, on the late afternoon of July 26, 2006, Jellison called her to his office to discuss a potential job transfer. When Baez arrived, Jellison locked the door. They initially talked about the possibility of Baez transferring to Jellison's department, which Baez did not want. Suddenly, without any warning, Jellison got up from behind his desk, approached Baez, and sexually assaulted her. Jellison's conduct included placing his hand under Baez's skirt, pinning her against a wall when she tried to leave, and exposing and licking her breast. Immediately after the incident, Baez called her best friend. When Baez arrived at her friend's home a short time later and told her about the assault, she was crying and her shirt was torn.

At trial, Jellison denied that any sexual assault occurred. He testified that, on the afternoon of July 26, 2006, Baez showed up at his office unannounced to demand that she be transferred to his department. They briefly discussed the matter and Baez then left the office without incident. Jellison further denied that he had a romantic interest in Baez at any time and stated that they solely had a friendly work relationship. He admitted that the emails in question were sent to Baez from his personal email account, but he either denied sending the emails himself or stated that he could not recall whether he sent them.

In November 2006, a few months after the alleged assault, Jellison reported to the District that Baez had engaged in misconduct at work. The following month, the District retained outside counsel, Sukhi Sandhu, to investigate an allegation of workplace misconduct involving Baez and another District employee. In February 2007, during the course of that investigation, Baez reported to Sandhu that Jellison had sexually harassed her. In addition to providing Sandhu with copies of select emails that Jellison had sent to her, Baez told Sandhu that Jellison had sexually assaulted her in his office on July 26, 2006. The District thereafter authorized Sandhu to conduct an investigation of Baez's

9

sexual harassment complaint. During an interview with Sandhu, Jellison denied he ever sexually touched Baez. He also denied sending Baez any sexually inappropriate emails, but refused to provide Sandhu with copies of their email correspondence. Jellison claimed that Baez had fabricated a sexual assault allegation against him because he had reported her misconduct to the District. Sandhu did not find Jellison's denials of Baez's allegations to be credible.

During the investigation of her sexual harassment complaint, Baez encountered Jellison at the District's administrative offices on two occasions. They did not speak, but Baez was upset because she had been assured that she would not have any contact with him. On March 20, 2007, the day after her second encounter with Jellison, Baez went on a medical leave of absence pursuant to a doctor's note provided by her psychiatrist. During part of her leave of absence, Baez was paid 50 percent of her salary as a disability benefit from the District. While she was on paid medical leave, Baez began working elsewhere; however, she did not notify anyone at the District of her other employment.

At the conclusion of her investigation of Baez's sexual harassment complaint, Sandhu prepared a written report of her findings, which she provided to Dr. Gregory Bowman, the Superintendent of the District. In her report, Sandhu found that Baez and Jellison had a consensual flirtatious relationship for a period of time, and that prior to July 26, 2006, Jellison's conduct was not unwelcome or offensive to Baez. However, in addressing Baez's sexual assault allegation, Sandhu specifically found: "With respect to the contention Mr. Jellison, on the afternoon of July 26, 2006, made comments of a sexual nature and engaged in acts of sexual touching, I find there is sufficient credible evidence to support some of the allegations. Given the nature of the emails exchanged between them and their extremely flirtatious relationship[,] it is more likely than not that something happened in the room that day. The question is whether what actually happened is closer to Ms. Baez's version or to what Mr. Jellison claims. . . . [¶] . . . [S]ince they were the only ones in the office, it is difficult to determine the exact nature of the events that transpired there on July 26, 2006. Nonetheless, given the manner in which Ms. Baez described the conduct and the manner in which Mr. Jellison responded to

10

the allegations, I believe the conduct that took place in the room more closely comports with Ms. Baez's version of the events than Mr. Jellison's. Mr. Jellison was not credible when responding to the allegations brought by Ms. Baez." Based on these findings, Sandhu recommended the District take appropriate corrective action to prevent the conduct from reoccurring.

In May 2007, Baez received a letter from Dr. Bowman regarding the results of the District's investigation of her sexual harassment complaint. In the letter, Dr. Bowman stated that the District's investigator had determined that the emails sent by Jellison to Baez were not inappropriate or offensive, and that contrary to her claim, Baez had been an active and willing participant in many of these communications. Dr. Bowman further stated that the District's investigator had determined that, "while certain conduct may have taken place" between Baez and Jellison in Jellison's office on July 26, 2006, "it was either not as [Baez] described and/or not unwelcome." Shortly after receiving the letter from Dr. Bowman, Baez filed a civil lawsuit against the District and Jellison.

In June 2007, Baez received a notice from the District informing her that she was being demoted from a senior administrative secretary to a budget accounting technician. The demotion would mean that Baez would need to have more contact with Jellison on work-related matters. In an accompanying statement of charges, the District indicated that, among other acts, Baez had utilized District resources and equipment to have personal email exchanges with Jellison in violation of District policy, and had falsely represented to the District's investigator that she was offended by these communications when she was in fact an active and willing participant in them. After receiving notice of the demotion, Baez decided not to return to work from her medical leave of absence, and the District eventually terminated her employment.

In July 2007, the District disciplined Jellison for misusing District resources and equipment in his email correspondence with Baez. Jellison's job title was changed from Chief Facilities Officer to Senior Director of Facilities and he received a reduction in salary. Despite the change in title, however, Jellison's job responsibilities and reporting structure remained the same. After Baez's employment with the District was terminated,

11

Jellison's former salary was reinstated, but his job title was not restored and he later resigned.[6] Jellison was never disciplined by the District for any conduct related to the events that allegedly occurred in his office on July 26, 2006.

Baez testified that, following the sexual assault by Jellison, she sought treatment for depression and anxiety from a psychiatrist and a therapist who specialized in working with sexual assault victims. Her psychiatrist prescribed a variety of anti-depressant, anti-anxiety, and sleep aid medications, which Baez took for a few years. Baez's best friend testified that, after the assault, Baez appeared depressed, anxious, and withdrawn. She gained a lot of weight, did not take as much care with her physical appearance, and became hypersensitive about setting personal boundaries for herself and her daughters. Baez also began taking Ambien on a frequent basis as an escape from everyday life. By the third trial, Baez had stopped taking medication and attending individual therapy, but she continued to participate in victim support groups. Baez testified that she no longer thought about the assault every day, but she remained more guarded and not as joyful as she used to be.

## B.     The Jury's Verdict

At the conclusion of the third trial, the jury returned a special verdict in favor of Baez on her cause of action for hostile work environment harassment against the District and Jellison, and in favor of Jellison on the causes of action for battery, false imprisonment, and intentional infliction of emotional distress. The jury also found that Baez had proved by clear and convincing evidence that Jellison had acted with malice,

---

**6**     Following his resignation, Jellison filed a separate lawsuit against the District. Jellison stated under oath in that case that the District's counsel, Jeff Marderosian, had told him that both he and Baez would receive a pay cut and title change as part of a ploy to force Baez to resign, and that once Baez resigned, Jellison would be reinstated to his former title and pay. Jellison also stated that the District's counsel, Nancy Doumanian, had told him that Sandhu's investigation of Baez's sexual harassment complaint was "the worst investigation she'd ever seen, however she would not tell the courts this as it would increase the liability to the District."

12

oppression, or fraud. The jury awarded Baez $199,398 in compensatory damages (consisting of $99,398 for past economic loss and $100,000 for past pain and suffering), and $2 in punitive damages. The jury returned a special verdict in favor of the District on its cross-claim against Baez for intentional misrepresentation, and found that the District had proved by clear and convincing evidence that Baez had acted with malice, oppression, or fraud. The jury awarded the District $19,500 in compensatory damages and $1 in punitive damages.

### C.     The Awards of Attorney's Fees and Costs

Following the jury's verdict, Baez filed a motion for attorney's fees as a prevailing plaintiff under FEHA. Baez also filed a memorandum of costs in which she sought to recover, among other items, her expert witness fees. The District and Jellison filed an opposition to the motion for attorney's fees, and a motion to strike and tax costs. The trial court awarded attorney's fees to Baez in the amount of $3,224,569.30. The trial court struck the motion to strike and tax costs and awarded expert witness fees to Baez as a recoverable cost under FEHA.

The District and Jellison filed an appeal from the judgment entered in Baez's favor on the jury's special verdict, and an appeal from the post-judgment orders awarding Baez attorney's fees and costs. The appeals have been consolidated.

### DISCUSSION

## I.     Evidentiary Rulings

On appeal, the District and Jellison contend that the trial court prejudicially erred in ruling on two evidentiary issues. First, they argue that the trial court abused its discretion in admitting evidence of Sandhu's findings and opinions on credibility during her investigation of Baez's sexual harassment complaint. Second, they assert that the trial court abused its discretion in excluding evidence of Baez's marital problems as an alternative source of her alleged damages.

13

## A. Standard of Review

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 295; *Ceja v. Department of Transportation* (2011) 201 Cal.App.4th 1475, 1481.) "The trial court enjoys 'broad authority' over the admission and exclusion of evidence. [Citation.] . . . The trial court's authority is particularly broad 'with respect to rulings that turn on the relevance of the proffered evidence.' [Citation.] Furthermore, '[i]t is for the trial court, in its discretion, to determine whether the probative value of relevant evidence is outweighed by a substantial danger of undue prejudice. . . .' [Citation.]" (*McCoy v. Pacific Maritime Assn., supra*, at pp. 295-296.) In reviewing an evidentiary ruling, "the appellate court will not disturb the trial court's decision unless the trial court exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination." (*Ceja v. Department of Transportation*, *supra*, at p. 1481.)

Even where evidence has been erroneously admitted or excluded, the judgment shall not be reversed unless the reviewing court concludes that the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; §§ 353, 354.) "'[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.]" (*Easterby v. Clark* (2009) 171 Cal.App.4th 772, 783.)

## B. Admission of Evidence of Sandhu's Sexual Harassment Investigation

The District and Jellison first challenge the trial court's admission of evidence concerning the investigation that Sandhu conducted for the District on Baez's sexual harassment complaint. They specifically contend that Sandhu's opinions regarding the credibility of Baez and Jellison during her investigation were inadmissible because it was the exclusive role of the jury to evaluate the credibility of witnesses. They also claim that Sandhu's written report regarding her investigation was inadmissible hearsay.

14

### 1. Relevant Background

Prior to trial, the District and Jellison filed a motion in limine to exclude any reference to Sandhu's findings and opinions on the relative credibility of Baez and Jellison during her investigation of Baez's sexual harassment complaint. They argued that evidence of Sandhu's credibility assessments would invade the province of the jury to decide the ultimate issues of fact in the case. Baez opposed the motion on the grounds that Sandhu's credibility findings and opinions were relevant to determining whether Jellison sexually assaulted Baez and whether the District took appropriate corrective action after receiving the results of Sandhu's investigation.

The trial court denied the motion in limine. The court concluded that Sandhu's investigative findings and opinions were admissible under *Wellpoint Health Networks, Inc. v. Superior Court* (1977) 59 Cal.App.4th 110 (*Wellpoint*) because the District was asserting the adequacy of Sandhu's investigation as an affirmative defense to Baez's hostile work environment cause of action. The trial court also concluded that evidence of Sandhu's opinions on credibility would not invade the province of the jury because Sandhu would "not [be] making the credibility assessment as to who is telling the truth in the trial," but rather would be testifying about the contemporaneous credibility assessments that she had made as part of her investigation. In response to the trial court's ruling, defense counsel stated that she would consult with her client as to whether the District would consider waiving its affirmative defense regarding the adequacy of Sandhu's investigation.

Following some delay, the District filed a conditional withdrawal of its affirmative defense that it had properly and timely investigated Baez's sexual harassment complaint. Defense counsel indicated that the District would withdraw the affirmative defense, but only if the trial court excluded the evidence concerning Sandhu's investigation. The trial court found that the District's filing was procedurally improper and constituted an inappropriate request for an advisory opinion on the admissibility of the evidence. The court ordered defense counsel to inform the court by the following day whether the

15

District was in fact withdrawing the defense. Defense counsel thereafter advised the court that the District had decided not to do so.

Over defense counsel's objections, the trial court admitted into evidence the written report that Sandhu had submitted to the District regarding the results of her sexual harassment investigation. During her trial testimony, Sandhu confirmed the accuracy of the investigative findings that she made in the report, including her findings that the conduct that took place in Jellison's office on July 26, 2006 "more closely comports with Ms. Baez's version of the events than Mr. Jellison's," and that "Mr. Jellison was not credible when responding to the allegations brought by Ms. Baez." In addition, Sandhu testified that, during her investigation, she did not find Jellison's explanation as to why he could not provide her with any emails to be credible, and that she felt his denial of the events that Baez alleged took place in his office was false. Sandhu further testified that, although she believed that Baez was not credible in certain matters during the investigation, Sandhu nevertheless had found that Baez's version of the events that occurred on July 26, 2006 was "closer to the truth" than Jellison's.

### 2. Evidence of Sandhu's Investigation, Including Her Findings and Opinions on Credibility, Was Properly Admitted

The District and Jellison argue that the trial court erred in admitting evidence of Sandhu's opinions on the relative credibility of Baez and Jellison because "the jury was perfectly cable of drawing its own conclusions regarding credibility without her help." They also assert that the evidence was unduly prejudicial because Sandhu's credibility assessments invaded the province of the jury to decide the ultimate issue of whether Jellison sexually assaulted Baez. We conclude that the trial court did not abuse its discretion in admitting the challenged evidence because the District asserted as a defense at trial that it had properly and timely investigated Baez's sexual harassment complaint. As a result, Sandhu's investigative findings and opinions on credibility were highly probative on the issue of whether the District took appropriate corrective action in response to Baez's complaint for purposes of determining its liability under FEHA.

16

It is well-established that "FEHA imposes two standards of employer liability for sexual harassment, depending on whether the person engaging in the harassment is the victim's supervisor or a nonsupervisory coemployee." (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1040-1041.) An employer is liable for sexual harassment by a nonsupervisory coemployee "only if the employer (a) knew or should have known of the harassing conduct and (b) failed to take immediate and appropriate corrective action. [Citation.] This is a negligence standard." (*Id.* at p. 1041; see also Gov. Code, § 12940, subd. (j)(1) ["Harassment of an employee … by an employee other than an agent or supervisor shall be unlawful if the entity … knows or should have known of this conduct and fails to take immediate and appropriate corrective action."].) On the other hand, "an employer is strictly liable for *all* acts of sexual harassment by a supervisor." (*State Dept. of Health Services v. Superior Court*, *supra*, at p. 1042.)

To avoid liability for sexual harassment by a nonsupervisory coemployee under FEHA, an employer must take "prompt, reasonable and efficacious remedial action" in response to an employee's harassment complaint. (*Mathieu v. Norrell Corp.* (2004) 115 Cal.App.4th 1174, 1185.) "The employer's obligation to take prompt corrective action requires (1) that temporary steps be taken to deal with the situation while the employer determines whether the complaint is justified and (2) that permanent remedial steps be implemented by the employer to prevent future harassment once the investigation is completed. [Citation.]" (*Bradley v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1612, 1630.) Consequently, "when harassment is by a nonsupervisory employee, an employer's liability is predicated not on the conduct itself, but on the employer's response once it learns of the conduct. [Citation.]" (*Id* at p. 1631.)

At trial, the District asserted that Jellison was a nonsupervisory coemployee for purposes of liability under FEHA because he did not have the authority to discipline or discharge Baez or otherwise affect the terms of her employment. The District also asserted that it took appropriate corrective action in response to Baez's sexual harassment complaint by retaining Sandhu to conduct an independent investigation of the complaint and then disciplining Jellison for his inappropriate conduct once the investigation was

complete. Consistent with this theory, the jury was instructed that, to establish the District's liability for sexual harassment, Baez had to prove, among other elements, that "a supervisor engaged in [the harassing] conduct or that [the District] . . . knew or should have known of the conduct and failed to take immediate and appropriate corrective action." Accordingly, because the District was relying on the adequacy of its remedial actions as a defense to Baez's hostile work environment claim, evidence of Sandhu's investigative findings and the District's response to those findings was directly relevant to establishing the District's vicarious liability under FEHA.[7]

In particular, Baez presented evidence that, when the District notified her of the results of the investigation, it misrepresented Sandhu's reported findings by stating that its investigator had determined that, "while certain conduct may have taken place" between Baez and Jellison on July 26, 2006, "it was either not as [Baez] described and/or not unwelcome." Baez also presented evidence that, although Sandhu expressly found in her report that the conduct that took place in Jellison's office that day "more closely comports with Ms. Baez's version of the events than Mr. Jellison's," the District never disciplined Jellison for any conduct related to Baez's sexual assault allegation. Instead, the District disciplined Jellison solely for misusing District equipment to engage in improper email communications with Baez, while disciplining Baez for conduct that included falsely stating to Sandhu that she was offended by Jellison's emails. In addition, Baez presented evidence that the District's counsel told Jellison that the disciplinary actions being taken were only temporary and part of a ploy to force Baez to resign. In light of this evidence, Sandhu's determination that Baez was more credible than Jellison

---

[7] In its special verdict, the jury found that Jellison was a supervisor, which made the District strictly liable for Jellison's sexual harassment under FEHA. As a result of this finding, the jury did not reach the question of whether the District took immediate and appropriate corrective action once it knew or should have known of the harassing conduct. Nonetheless, the question of the District's vicarious liability for harassment was one of the disputed factual issues submitted to the jury.

18

in their respective versions of events was admissible to show that the District failed to take appropriate corrective action once it received the results of the investigation.

In arguing that the evidence of Sandhu's credibility determinations improperly usurped the role of the jury, the District and Jellison rely on a series of inapposite criminal cases. (See *People v. Melton* (1988) 44 Cal.3d 713; *People v. Smith* (1989) 214 Cal.App.3d 904; *People v. Sergill* (1982) 138 Cal.App.3d 34.) These cases support the general proposition that "[l]ay opinion about the veracity of particular statements by another is inadmissible on that issue." (*People v. Melton*, *supra*, at p. 744.) However, as the trial court observed, evidence of Sandhu's investigative findings, including her credibility assessments of the witnesses she interviewed, was not admissible as opinion evidence to prove or disprove the veracity of Baez or Jellison in their trial testimony. Rather, the evidence was admissible on the issue of the adequacy of Sandhu's investigation and the District's corrective action in response to that investigation. The admission of the evidence therefore did not invade the exclusive province of the jury to determine the credibility of witnesses and the weight to be accorded their testimony.[8]

The District and Jellison further contend that the written report that Sandhu prepared for the District regarding her investigative findings was inadmissible hearsay. However, "[w]here the reasonableness of a person's conduct is at issue, statements of

---

[8]     The District and Jellison also assert that the trial court erroneously relied on the *Wellpoint* decision in admitting the evidence of Sandhu's investigative findings because the issue in that case was discoverability. *Wellpoint* held that where an employer relies on the adequacy of its attorney's investigation as a defense to a hostile work environment claim, it waives the attorney-client privilege and work product doctrine, and the contents of the investigative file are subject to discovery. (*Wellpoint*, *supra*, 59 Cal.App.4th at p. 128.) While it is true that the decision specifically addressed the discoverability of an investigative file rather than its admissibility at trial, the *Wellpoint* court recognized that "[i]f a defendant employer hopes to prevail by showing that it investigated an employee's complaint and took action appropriate to the findings of the investigation, then it will have put the adequacy of the investigation directly at issue. . . ." (*Ibid*.) In this case, the District put the adequacy of Sandhu's investigation and its corrective actions directly at issue when it asserted that it properly investigated Baez's sexual harassment complaint.

19

others on which he acted are admissible. [Citations.]" (*Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 265.) Thus, materials generated during an employer's investigation of a harassment complaint are admissible for the non-hearsay purpose of establishing whether the investigation was "appropriate under the circumstances" and whether the employer's action in response to the investigation "was reasonable based on that information." (*Ibid*.) Here, Sandhu's investigative report was not admitted for the truth of the matters asserted in the report. Rather, the report provided evidence of the information that was in the District's possession when it took corrective action in response to Baez's sexual harassment complaint. Because the appropriateness of the District's corrective action was at issue in the case, the statements of others on which the District relied in taking such action were not hearsay. Under these circumstances, the trial court did not abuse its discretion in admitting the evidence of Sandhu's investigative report, including her supporting findings and opinions on credibility.

### C.     Exclusion of Evidence of Baez's Marital Problems

The District and Jellison also challenge the trial court's ruling excluding evidence of Baez's marital problems as an alternative source of her alleged damages. They assert that the evidence was highly probative on the cause of Baez's emotional distress, and that admission of the evidence would not have resulted in undue prejudice to Baez at trial.

#### 1.     Relevant Background

Prior to the start of the second trial, the parties repeatedly asked the trial court to rule upon the admissibility of evidence related to Baez's marital problems. The District and Jellison first raised the issue in their section 783 motion to permit the introduction of evidence of Baez's extramarital affair with Bradley. Among other evidence, the defense sought to present testimony that, during the same time period for which Baez was seeking emotional distress damages, her husband had a violent physical altercation with Bradley at the family's home, which led to Baez filing a petition for divorce and obtaining a restraining order against her husband. At a June 3, 2013 hearing on the motion, defense counsel argued that such evidence was relevant to proving that Baez's marital problems

20

were caused by her affair with Bradley rather than by the alleged assault by Jellison. In denying the section 783 motion, the trial court concluded that the evidence was not relevant on the issue of damages because Baez had waived any claim for damages related to her marriage. The court also concluded that any probative value of the evidence was substantially outweighed by the risk of undue prejudice under section 352.

On September 6, 2013, following the denial of the section 783 motion, the trial court held a hearing on the parties' motions in limine. One of the motions filed by Baez was a motion to exclude evidence of two incidents of domestic violence between Baez and her husband in May 2007. On each occasion, the police were called to the family's home, but no arrests were made. The first incident occurred on or about May 1, 2007, when Baez's husband found Bradley at the home fixing a water heater and got into a physical confrontation with him. The second incident occurred on or about May 22, 2007, when Baez and her husband had an altercation in the home. That same day, Baez applied for a restraining order against her husband and filed a petition for dissolution of the marriage. In her motion, Baez argued that evidence of these marital problems was irrelevant to the issues to be tried and that any probative value was substantially outweighed by the risk of undue prejudice.

The District and Jellison filed an opposition to the motion in limine. They contended that evidence of Baez's marital problems was relevant to prove an alternative cause of her alleged emotional distress damages. In particular, they argued that evidence of the domestic violence incidents "would refute [Baez's] claim that the only reason her marriage suffered was because of Jellison's alleged assault," and would allow the jury to "find that the cause for [Baez's] marriage breakdown was [her] affair with another man, most likely Steve Bradley." The District and Jellison also asserted that the probative value of the evidence outweighed the risk of undue prejudice.

At the September 6, 2013 hearing, the trial court granted Baez's motion in limine. Consistent with its ruling on the section 783 motion, the trial court concluded that the evidence of Baez's marital discord was not relevant to her alleged damages because Baez had expressly waived any claim for damages related to the effect that Jellison's conduct

21

had on her marriage. The court also concluded that admission of the evidence would be more prejudicial than probative under section 352.

On October 9, 2013, the trial court held a hearing on additional pretrial motions that had been filed by the District and Jellison. In one of their motions, the District and Jellison again sought to introduce evidence related to Baez's marital problems, including evidence that the trial court previously had ruled was inadmissible. In particular, they sought to present testimony that (1) "on May 1, 2007, the police were called to [Baez's] home relating to a confrontation between [Baez] and her husband," (2) Baez "had a confrontation with her husband on May 22, 2007, in which she alleges he was threatening or physically abusive," (3) Baez "filed a Petition for Dissolution of Marriage on May 22, 2007," and (4) Baez "obtained a restraining order against her husband on or about June 5, 2007, alleging that he was physically abusive." In another motion, they argued that any testimony by Baez's mental health expert regarding her emotional distress damages would place Baez's affair with Bradley directly at issue, and thus make evidence of the affair admissible.

At the start of the October 9, 2013 hearing, the trial court made clear that its prior ruling on the section 783 motion was a "final ruling" on the matter, and that the Baez-Bradley affair was "not going to be mentioned [or] . . . used as an argument on another motion." Notwithstanding this admonition, defense counsel argued during the hearing that certain evidence to be offered by Baez, such as testimony about the adequacy of Sandhu's investigation or the cause of Baez's emotional distress, would "open the door" to evidence of her affair with Bradley. The trial court rejected this argument, stating "there's not going to be any door-opening" on the affair. The court also noted that it was "very disturbing" that defense counsel was continuing to argue the matter after the court had ruled "on any number of occasions very forcibly that this Bradley affair is not going to be mentioned."

During the October 9, 2013 hearing, the trial court again addressed the admissibility of evidence concerning Baez's marital problems. Consistent with its prior rulings, the trial court initially denied the defense request to introduce evidence of the

domestic violence incidents that took place between Baez and her husband in May 2007. The court noted that these incidents implicated Baez's affair with Bradley, and that Baez was not seeking any damages related to her marital relationship. However, later in the hearing, the court partially changed its ruling in response to representations by counsel. Specifically, defense counsel argued that evidence of May 22, 2007 domestic violence incident, which led to Baez filing a petition for divorce and seeking a restraining order against her husband, should be allowed because it was entirely unrelated to the Baez-Bradley affair. In support of this argument, defense counsel asserted that both Baez and her husband had testified in the first trial that this incident arose because Baez's husband was angry about her email exchanges with Jellison, and not about her affair with Bradley. Based on these representations, the trial court decided that it would allow evidence of events related to the May 22, 2007 incident, including the filing of the divorce petition and restraining order.

The following day, however, the trial court reconsidered this ruling. At that time, Baez's counsel informed the court that the testimony from the first trial showed that the May 22, 2007 domestic violence incident largely pertained to Baez's affair with Bradley and had nothing to do with Jellison. After reviewing the trial transcript and confirming that May 22, 2007 incident related to Bradley and not to Jellison, the trial court reversed its prior ruling allowing evidence of that domestic dispute and ordered that any evidence related to Baez's marital problems was inadmissible.

The trial court's ruling remained in effect through both the second and third trials. During the third trial, Baez and her best friend each testified about the depression and anxiety that Baez suffered following the alleged assault by Jellison. In testifying about Baez's emotional distress, neither witness mentioned any marital discord that she had experienced. Defense counsel nevertheless objected to this area of inquiry, and outside the presence of the jury, argued that each witness's testimony "opened the door" to other potential causes of Baez's emotional distress, including her affair with Bradley and the problems in her marriage. The trial court overruled the objections and reiterated that its prior rulings on the matter stood.

## 2. Evidence of Baez's Martial Problems Was Properly Excluded

On appeal, the District and Jellison argue that evidence of Baez's marital problems was directly relevant to her claim for damages because these problems occurred during the same time period for which Baez was claiming that Jellison's conduct caused her emotional distress, and thus, were a potential alternative cause of her alleged damages. The District and Jellison further argue that the evidence was not unduly prejudicial because it did not explicitly refer to Baez's extramarital affair with Bradley, and the jury would not need to know the exact source of Baez's marital discord to determine whether it caused or contributed to her emotional distress. We conclude that the trial court did not abuse its discretion in excluding the evidence of Baez's marital problems on retrial.

In any civil action, a plaintiff has a constitutional right to privacy that protects the marital relationship. (*Vinson v. Superior Court* (1987) 43 Cal.3d 833, 841; see also *Tylo v. Superior Court* (1997) 55 Cal.App.4th 1379, 1388 (*Tylo*) ["[t]here can be no doubt that the marital relationship serves as a foundation for an assertion of the right to privacy"].) The filing of a sexual harassment suit, even one which alleges severe emotional distress, does not operate as an implicit waiver of the right to privacy in marital or sexual matters. (*Mendez v. Superior Court* (1988) 206 Cal.App.3d 557, 566 (*Mendez*).) "'[W]hile the filing of a lawsuit may implicitly bring about a partial waiver of one's constitutional right of associational privacy, the scope of such "waiver" must be narrowly rather than expansively construed. . . .'" (*Vinson v. Superior Court*, *supra*, at p. 842.) In the context of discovery, "an implicit waiver of a party's constitutional rights encompasses only discovery directly relevant to the plaintiff's claim and essential to the fair resolution of the lawsuit." (*Ibid*.) "'"[E]ven when discovery of private information is found directly relevant to the issues of ongoing litigation, it will not be automatically allowed; there must then be a 'careful balancing' of the 'compelling public need' for discovery against the 'fundamental right of privacy.'"' [Citation.]" (*Mendez*, *supra*, at p. 567, fn. omitted.)

In *Tylo*, the defendants in a wrongful termination action argued that because the plaintiff was seeking emotional distress damages, they had "a right to discover 'other stressors that *might* have caused, or contributed to, [the plaintiff's] alleged emotional

24

injuries,' including any emotional distress resulting from her marriage." (*Tylo*, *supra*, 55 Cal.App.4th at p. 1386.) The court of appeal rejected this argument. Given the plaintiff's fundamental right to privacy in her marriage, the court held that, before the defendants "can obtain information regarding emotional distress from the marital relationship, they must first identify the specific emotional injuries which [the plaintiff] claims resulted from [the defendants' conduct] and then demonstrate there is a nexus between damages from [that conduct] and those which may arise out of the marital relationship." (*Id*. at p. 1388.) Because the defendants in *Tylo* failed to do either, they were not entitled to discovery of any alleged emotional distress arising from the plaintiff's marriage. (*Ibid*.)

Similarly, in *Mendez*, the employer in a sexual assault and battery suit sought discovery related to the plaintiff's sexual conduct, including any marital infidelity, on the ground that it was relevant to determining the cause and extent of her emotional distress damages. (*Mendez*, *supra*, 206 Cal.App.3d at p. 571.) The court of appeal concluded that the employer had failed to establish good cause for the discovery. (*Id*. at pp. 573-574.) The court observed that "[a]n essential aspect of the damage in any case of sexual harassment, sexual assault or sexual battery is the outrage, shock and humiliation of the individual abused," and "[t]hus, the average or usual case would normally carry with it a concomitant claim for emotional upset inflicted by the conduct." (*Id*. at p. 573.) The court also noted that the employer's "argument, taken to its natural conclusion, would allow inquiry into anything that might conceivably cause some measure of distress or anxiety without regard to its protected nature," and that "such inquiry would at most generate results of minimal probative value." (*Ibid*.) The court therefore held that "in a case involving sexual harassment, sexual assault or sexual battery, the bare fact that plaintiff alleges that the improper behavior produced emotional distress will not justify a defendant's requested invasion of plaintiff's sexual privacy . . . . In order to justify such inquiry, either the plaintiff must claim some special damage [citations] or defendant must demonstrate some extraordinary circumstance attendant to plaintiff's claim." (*Ibid*.)

As in *Tylo* and *Mendez*, Baez's filing of a sexual harassment suit did not function as an implicit waiver of her fundamental right to privacy in her marital relationship.

25

While Baez sought to recover damages for emotional distress caused by Jellison's alleged sexual assault, she did not claim any damages for loss of consortium or other "special damage" related to her marriage. (*Mendez*, *supra*, 206 Cal.App.3d at p. 573.) In fact, prior to trial, Baez's counsel expressly agreed that Baez would not present any evidence about the effect of Jellison's conduct on her marriage or seek damages for any marital discord that she experienced as a result of Jellison's conduct.

The District and Jellison nevertheless contend that evidence of Baez's marital problems was relevant to show that "something else may have caused or contributed to her emotional distress in the relevant time period." It is true that where a plaintiff places his or her mental health at issue, evidence of marital discord can be relevant to demonstrating an alternative cause of alleged emotional distress damages. The relevance of such evidence, however, must be carefully balanced against the plaintiff's right to marital privacy. In this case, the District and Jellison have not demonstrated the requisite "nexus" between the emotional distress that Baez claimed was caused by Jellison's conduct and the emotional distress that allegedly arose from Baez's marital relationship. (*Tylo*, *supra*, 55 Cal.App.4th at p. 1388.) Instead, they merely identify certain events in the marriage that occurred within the same time frame for which Baez was seeking emotional distress damages and vaguely assert that "it might be inferred that marital troubles could also explain at least some of Baez's emotional distress." As in *Tylo* and *Mendez*, the mere assertion that these other stressors might have caused or contributed to the alleged emotional distress does not justify the intrusion into the right of privacy in the marital relationship.

Moreover, although evidence of a plaintiff's marital discord can be relevant to a claim for emotional distress damages, the trial court did not abuse its discretion in ruling that the evidence of Baez's marital problems was more prejudicial than probative under section 352. As the trial court observed, "a great part of . . . the distress in the marriage [was] the affair with Bradley." The procedural context in which the trial court made this ruling must be considered. In the first trial, the District and Jellison were able to present extensive evidence of the Baez-Bradley affair, and the jury devoted a large portion of its

26

deliberations discussing the affair and how it negatively affected Baez's credibility. As this court concluded in reversing the judgment in the first trial, "the question of whether Jellison sexually assaulted Baez on July 26, 2006, was lost in a trial focused on Baez's relationship with Bradley," which resulted in prejudice to Baez.

On remand, the trial court thus sought to ensure that evidence which referred to Baez's marital infidelity, whether explicitly or implicitly, was closely scrutinized for its potentially prejudicial effect. At the pretrial hearings held before the second trial, the District and Jellison initially sought to connect the evidence of Baez's marital problems to her extramarital affair. Indeed, in both their section 783 motion and their opposition to Baez's motion in limine, the District and Jellison contended that Baez's marital discord was relevant to her emotional distress damages precisely because these problems stemmed from her affair with Bradley rather than from the alleged assault by Jellison.[9] Although the District and Jellison later argued that the evidence of Baez's marital discord could be stripped of any explicit references to Bradley, the more "sanitized" version of the evidence that they presented to the trial court still pertained to deeply personal aspects of Baez's marital relationship, including incidents of domestic violence, police visits to the family's home, and the filing of a restraining order against Baez's husband. Additionally, in her October 9, 2013 argument before the trial court, defense counsel misrepresented the extent to which these events in Baez's marriage were directly related to the affair with Bradley, and despite the court's prior rulings on the matter, she continued to assert that any testimony about Baez's emotional distress damages would "open the door" to evidence of the affair. Under these circumstances, the trial court

---

**9** According to the opposition filed by the District and Jellison, both incidents of domestic violence that were the subject of Baez's motion in limine directly implicated her affair with Bradley. The first incident occurred when Baez's husband found Bradley outside the family's home and tried to strangle him, and the second incident occurred when Baez's husband accused Baez of having an affair with another man.

27

reasonably could conclude that evidence of marital problems which implicitly referred to the Baez-Bradley affair created a substantial risk of undue prejudice.[10]

The totality of the record reflects that the trial court diligently reviewed the evidence of Baez's marital problems and this court's prior opinion, and carefully weighed the probative value of the evidence against the risk of undue prejudice, consumption of time, and confusion of the issues. Even without explicit references to Baez's extramarital affair, the evidence concerned highly personal events in her marital relationship. Given the nature of the evidence, the privacy rights involved, and the procedural history of the case, the trial court did not abuse its discretion in concluding that the probative value of the evidence was substantially outweighed by the risk that its admission would result in undue prejudice to Baez on retrial. The evidence was therefore properly excluded.

## II.   Award of Attorney's Fees

The District and Jellison next contend that the trial court erred in awarding attorney's fees to Baez as the prevailing plaintiff in a FEHA action. They specifically assert that Baez was not entitled to recover attorney's fees for time spent in the first trial because she did not prevail in that trial and the reversal of the judgment on appeal was due to the trial court's erroneous rulings. They also argue that the trial court improperly included the time spent in the first trial in calculating the fee award solely to sanction the District and Jellison for their litigation strategy. We conclude that the trial court did not abuse its discretion in determining the attorney's fees to be awarded to Baez.

FEHA provides that, "[i]n actions brought under this section, the court, in its discretion, may award to the prevailing party reasonable attorney's fees and costs. . . ." (Gov. Code, § 12965, subd. (b).) "The basic, underlying purpose of FEHA is to safeguard

---

[10]     The trial court's concerns that even implicit references to Baez's extramarital affair with Bradley could prejudice Baez on retrial were well-founded. Notwithstanding the trial court's detailed evidentiary rulings and clear directions to the parties and their counsel that any explicit or implicit reference to the Baez-Bradley affair was prohibited, defense counsel repeatedly violated the court's in limine orders during the second trial. As a result, a mistrial was declared and the case had to be tried to a jury a third time.

28

the right of Californians to seek, obtain, and hold employment without experiencing discrimination on account" of their membership in a protected class. (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 582-583.) An award of reasonable attorney's fees accomplishes "the Legislature's expressly stated purpose of FEHA 'to provide effective remedies that will eliminate these discriminatory practices.'" (*Id.* at p. 583.)

"'In determining the fee award, the trial court must first determine "a 'lodestar' or 'touchstone' figure, which is the product of the number of hours worked by the attorneys and a reasonable fee per hour." [Citations.] The trial court then has the discretion to increase or reduce the lodestar figure by applying a positive or negative "'multiplier'" based on a variety of factors. [Citations.]' [Citation.]" (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1249.) "'[A]bsent circumstances rendering the award unjust, an attorney fee award should ordinarily include compensation for *all* the hours *reasonably spent*' in litigating the action to a successful conclusion. [Citation.]" (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 394; see also *Vo v. Las Virgenes Municipal Water Dist.* (2000) 79 Cal.App.4th 440, 446 ["[u]nder the lodestar method, a party who qualifies for a fee should recover for all hours reasonably spent unless special circumstances would render an award unjust"].)

"Generally, a trial court's determination that a litigant is a prevailing party, along with its award of fees and costs, is reviewed for abuse of discretion. [Citations.]" (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.) Therefore, "'[i]n reviewing a challenged award of attorney fees and costs, we presume that the trial court considered all appropriate factors in selecting a multiplier and applying it to the lodestar figure. [Citation.] This is in keeping with the overall review standard of abuse of discretion, which is found only where no reasonable basis for the court's action can be shown. [Citation.]' [Citations.]" (*Taylor v. Nabors Drilling USA, LP*, *supra*, 222 Cal.App.4th at pp. 1249-1250.) As our Supreme Court has observed, "'[t]he "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his [or her] judgment is of course subject to review, it will not be disturbed unless the appellate

29

court is convinced that it is clearly wrong" -- meaning that it abused its discretion. [Citations.]'" (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.)

In this case, the trial court properly exercised its discretion in awarding attorney's fees to Baez for the time spent in the first trial. As a prevailing party under FEHA, Baez was entitled to recover attorney's fees for all the hours that her counsel reasonably spent litigating the action to a successful conclusion. This included the time spent litigating the action in the first trial because Baez successfully appealed from the judgment entered in favor of the defense following the verdict in the first trial and then prevailed in her FEHA cause of action on retrial. As the trial court explained in finding that the time spent in the first trial was compensable: "The sole reason that this case, trial number one, was reversed was because defense counsel did not comply with [section] 783. Having not complied with [section] 783 and caused a reversal in full, the defendant is liable for attorney's fees for the first trial, all the work leading up to the first trial, and the appeal on the first trial." The trial court's ruling did not reflect an intent to punish the District and Jellison for their litigation strategy, but rather an intent to compensate Baez for the reasonable hours her attorneys spent litigating the action to its conclusion. The trial court reasonably found that Baez was entitled to recover attorney's fees for the time spent in the first trial because neither Baez nor her counsel caused the errors that led to the reversal of the judgment on appeal. Instead, the reversal was the result of the District and Jellison's noncompliance with the Evidence Code in seeking to present evidence of Baez's sexual relationship with Bradley.

The District and Jellison argue that the judgment in the first trial was not reversed because they failed to comply with the procedural requirements of section 783, but rather because the trial court erred in admitting evidence of Baez's extramarital affair with Bradley over Baez's objections. This argument lacks merit. The District and Jellison were the parties that sought to present the evidence of the Baez-Bradley affair at trial. Under section 783, they had a duty to comply with the statute's strict requirements by filing a written motion prior to trial and making an offer of proof of the relevancy of the evidence. They did not file such a motion prior to the first trial. When Baez then brought

30

a motion in limine to exclude evidence of the affair with Bradley, the District and Jellison opposed that motion, arguing that the affair was relevant to Baez's credibility and claim for damages. After the trial court denied the motion in limine, the District and Jellison made Baez's affair with Bradley the focus of their defense. They presented extensive evidence of the affair to the jury, including sexually explicit emails exchanged between Baez and Bradley, which bore no relevance to Baez's credibility or damages. As this court concluded in its prior opinion, the "noncompliance with section 783 resulted in an evisceration of the protections of section 1106 and 783 as contemplated by the Legislature," requiring reversal of the judgment and remand of the case for a new trial. The responsibility for such noncompliance clearly rested with the District and Jellison.

Citing the decision in *Californians for Responsible Toxics Management v. Kizer* (1989) 211 Cal.App.3d 961 (*Kizer*), the District and Jellison also assert that Baez was not entitled to attorney's fees for the hours expended in the first trial unless she could prove the time spent was "'both useful and necessary and directly contributed to the resolution of the action.'" We disagree. *Kizer* addressed an attorney's fee issue that has no application here—whether the prevailing party in a private attorney general suit filed against a government agency may recover attorney's fees for time spent in a related administrative proceeding. The court of appeal in that case held that the party could recover its attorney's fees by showing that the "time spent in a related administrative proceeding was reasonably expended on the litigation because it was both useful and necessary and directly contributed to the resolution of the action." (*Id.* at p. 972.) *Kiser* did not, however, address the proper determination of a fee award where, as here, a party that initially lost at trial files a successful appeal and then prevails in the action on retrial.

Accordingly, Baez's right to recover attorney's fees as a prevailing party under FEHA was governed by the long-standing rule that "absent facts rendering the award unjust, parties who qualify for a fee should recover for all hours reasonably spent." (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 632-633; see also *Horsford v. Board of Trustees of California State University*, *supra*, 132 Cal.App.4th at p. 394; *Vo v. Las Virgenes Municipal Water Dist.*, *supra*, 79 Cal.App.4th at p. 446.) The record reflects that the trial

31

court carefully considered the relevant factors in determining the amount of attorney's fees to be awarded to Baez as a prevailing party, and reasonably concluded that Baez was entitled to recover attorney's fees for the hours expended by her counsel in the first trial. We see no abuse of discretion in the trial court's determination of the fee award.

## III.    Award of Expert Witness Fees

The District and Jellison also challenge the trial court's award of expert witness fees to Baez. They contend that Baez was not entitled to recover expert witness fees as a prevailing party under FEHA because she did not file a separate motion requesting such fees and instead sought them in a memorandum of costs. We conclude that the trial court did not abuse its discretion in awarding expert witness fees to Baez, and even assuming that a separate motion was required, the District and Jellison suffered no prejudice.

Code of Civil Procedure section 1032 states, in pertinent part, that "[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (Code Civ. Proc., § 1032, subd. (b).) While the fees of court-ordered experts are allowable as costs under Code of Civil Procedure section 1032, the fees of a party's expert witnesses are ordinarily not recoverable under the statute. (Code Civ. Proc., § 1033.5, subds. (a)(8), (b)(1).) FEHA, on the other hand, provides that "the court, in its discretion, may award to the prevailing party . . . reasonable attorney's fees and costs, including expert witness fees." (Gov. Code, § 12965, subd. (b).) Government Code section 12965, subdivision (b) thus "governs cost awards in FEHA actions, allowing trial courts discretion in awards of both attorney fees and costs to prevailing FEHA parties." (*Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97, 99.) Although a cost award under FEHA is discretionary rather than mandatory, "a prevailing plaintiff should ordinarily receive his or her costs . . . unless special circumstances would render such an award unjust." (*Id.* at p. 115, italics omitted.)

In arguing that Baez was precluded from seeking her expert witness fees in a memorandum of costs, the District and Jellison rely on the decision in *Anthony v. City of*

*Los Angeles* (2008) 166 Cal.App.4th 1011 (*Anthony*). In *Anthony*, the prevailing plaintiff in a FEHA action filed a noticed motion to recover her expert witness fees. On appeal, the defendant argued that the motion was untimely because it was not filed within the 15-day time limit for filing a memorandum of costs as set forth in California Rules of Court, rule 3.1700.[11] (*Id.* at p. 1015.) The court of appeal rejected this argument, reasoning that the time constraints of rule 3.1700 applied only to "those cost items to which a party is entitled 'as a matter of right,'" and not to "those cost items which are awarded in the discretion of the court and thus *cannot* be entered by the clerk of the court under rule 3.1700." (*Id.* at pp. 1015, 1016). The court therefore concluded that, in the absence of a specific rule applicable to the discretionary award of expert witness fees, the plaintiff was not required to claim her expert witness fees under FEHA by filing a memorandum of costs, and could instead seek to recover those fees by way of a noticed motion. (*Id.* at p. 1016.) *Anthony* did not, however, address whether a prevailing party in a FEHA action *must* seek expert witness fees in a separate motion rather than in a memorandum of costs.

While we are unaware of any published decision that directly addresses the argument raised by the District and Jellison, a similar claim was rejected in *Jonkey v. Carignan Construction Co.* (2006) 139 Cal.App.4th 20 (*Jonkey*). In *Jonkey*, the prevailing defendants in a civil action were awarded their expert witness fees under the discretionary cost award provisions of Code of Civil Procedure section 998.[12] On appeal,

---

**11** Under rule 3.1700, "[a] prevailing party who claims costs must serve and file a memorandum of costs within 15 days after the date of service of the notice of entry of judgment or dismissal by the clerk. . . ." (Cal. Rules of Court, rule 3.1700(a)(1).) "Any notice of motion to strike or to tax costs must be served and filed 15 days after service of the cost memorandum," and "[a]fter the time has passed for a motion to strike or tax costs or for determination of that motion, the clerk must immediately enter the costs on the judgment." (Cal. Rules of Court, rule 3.1700(b)(1), (b)(4).)

**12** Code of Civil Procedure section 998 authorizes a discretionary award of expert witness fees and other costs against a plaintiff who does not accept a statutory offer to compromise if the plaintiff fails to obtain a more favorable judgment. (Code Civ. Proc., § 998, subd. (c)(1).)

33

the plaintiff contended that the defendants were not entitled to their expert witness fees because a cost award was discretionary and the defendants did not file a separate motion to recover those fees but instead claimed them in a memorandum of costs. (*Id*. at p. 26.) The court of appeal held that the trial court did not err in awarding expert witness fees "claimed in a cost bill rather than a noticed motion." (*Id*. at p. 27.) As the court succinctly explained: "Code of Civil Procedure section 998 grants the trial court discretion to award expert witness fees to a qualifying prevailing party. The fees may be claimed in a cost bill; there is no rule requiring a noticed motion." (*Ibid*.) Similarly, Government Code section 12965, subdivision (b), which governs cost awards in FEHA actions, does not contain any provision requiring the filing of a noticed motion to recover expert witness fees or other costs. The statute simply authorizes the trial court to award such costs to the prevailing party "in its discretion." (Gov. Code, § 12965, subd. (b).)

Even assuming that Baez was required to file a separate motion to recover her expert witness fees under FEHA, there was no prejudicial error in this case. The record reflects that, in response to Baez's memorandum of costs, the District and Jellison filed a motion to strike and tax costs in which they objected to, among other items, the expert witness fees. At the hearing on the parties' post-judgment motions, the trial court ordered that the motion to strike and tax costs be stricken with prejudice because the District and Jellison repeatedly violated the California Rules of Court in filing their motion.[13] However, notwithstanding this ruling, the trial court addressed the merits of the objections raised by the District and Jellison to certain costs sought by Baez. In particular, the trial court noted that expert witness fees were recoverable as costs under

[13]    As set forth in the trial court's minute order, the District and Jellison previously had filed an oversized brief in support of their motion to strike and tax costs. After the trial court struck that motion without prejudice for failure to comply with the page limitations, the District and Jellison simply changed the line spacing in their brief to make it largely single-spaced and refiled the motion. The trial court then struck the refiled motion with prejudice for violating the California Rules of Court on page limitations and line spacing. (See Cal. Rules of Court, rules 3.1113(d) and 2.108(1).)

FEHA within the court's discretion, and then stated that it was exercising its discretion to award Baez her expert witness fees. Given that the trial court expressly determined at the hearing that Baez was entitled to expert witness fees as a prevailing plaintiff under FEHA, the District and Jellison suffered no prejudice from the procedural mechanism by which Baez sought to recover those fees.

## IV.     Post-Judgment Interest Rate

Lastly, the District and Jellison contend, and Baez concedes, that the trial court should have awarded post-judgment interest to Baez at the rate of 7 percent per annum instead of 10 percent. Article XV, section 1, of the California Constitution provides that "[i]n the absence of the setting of such rate by the Legislature, the rate of interest on any judgment rendered in any court of the state shall be 7 percent per annum." Although Code of Civil Procedure section 685.010, subdivision (a) states that "[i]nterest accrues at the rate of 10 percent per annum on the principal amount of a money judgment remaining unsatisfied," the California Supreme Court has held that this statutory provision is not applicable to a judgment against a local public entity because Government Code section 970.1, subdivision (b) "plainly and expressly exempts local public entities from the application of title 9 of the Code of Civil Procedure *as a whole*, including . . . section 685.010." (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 347.) Because the Legislature has not specifically provided for a different rate for post-judgment interest against a local public entity, the constitutional rate of 7 percent per annum applies. (*Id.*, at p. 345.) The judgment in favor of Baez must therefore be modified to reflect a post-judgment interest rate of 7 percent.

35

**DISPOSITION**

The judgment is modified to award post-judgment interest to Baez at the rate of 7 percent per annum.  As modified, the judgment is affirmed.  Baez shall recover her costs on appeal.


ZELON, J.


We concur:


PERLUSS, P. J.


SEGAL, J.